THE STATE OF OHIO, APPELLEE, *v*. FOUST, APPELLANT.

[Cite as *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006.]

*Criminal law — Aggravated murder — Death penalty upheld, when.*

(No. 2002-1350 — Submitted October 12, 2004 — Decided December 29, 2004.)

APPEAL from the Court of Common Pleas of Cuyahoga County, No. CR-406021.

_____

O'DONNELL, J.

{¶ 1} In this appeal, defendant-appellant, Kelly Foust, raises 13 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstances against the mitigating factors and have compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Foust's sentence of death.

{¶ 2} During the early morning of March 31, 2001, Foust broke into the home of 54-year-old Jose Coreano in Cleveland. Foust entered Jose's first-floor bedroom and killed him with a hammer blow to the head. Foust then went upstairs and repeatedly raped Jose's 17-year-old daughter, Damaris Coreano. After stealing items from the house, Foust tied Damaris to the bathtub and set the house on fire; despite her situation, Damaris managed to escape.

{¶ 3} A three-judge panel convicted Foust of the aggravated murder of Jose, the kidnapping, rape, gross sexual imposition, and attempted murder of Damaris, and aggravated burglary, aggravated robbery, and aggravated arson. Foust was sentenced to death. To establish Foust's guilt, the state introduced Foust's pretrial confession, testimony from Damaris identifying Foust as her assailant, and the murder weapon containing Foust's DNA.

***State's case***

**{¶ 4}** Foust was distraught after his relationship with his girlfriend, Janira Acevedo, came to an end. Damaris and her sister, Cheyla Coreano, were friends with Acevedo. After Foust and Acevedo broke up, Acevedo began staying at the Coreano home.

**{¶ 5}** Sometime before March 28, 2001, Foust broke into the Coreano home. On March 28, Jose, Cheyla, and Acevedo went to the police, seeking a restraining order against Foust. They did not receive a restraining order, but the police offered to send a patrol car to their residence. Jose, however, refused this offer.

**{¶ 6}** During the early morning hours of March 31, Foust had been drinking beer and wine and "getting pretty wasted." At some point, Foust went looking for Acevedo at a home on Sackett Avenue, where he thought she was staying. Foust peeked into a window of that home and realized that Acevedo was not there. Foust later explained, "I got really mad because [Acevedo] told me she stays there every night and doesn't go anywhere."

**{¶ 7}** Foust then went to the Coreano home and gained entry through an open basement window. Foust found Damaris sleeping upstairs but did not locate Cheyla or Acevedo. Foust then went to Jose's bedroom on the first floor and struck Jose on the head with a claw hammer.

**{¶ 8}** Foust returned to the second-floor bedroom where Damaris was sleeping and got on top of her. When she awakened, Foust put a knife to her neck, shoved her face into the pillow, and ordered her to lie on her stomach. She tried to grab the knife, but Foust told her not to be a hero because "in reality heroes die." Foust asked Damaris for "the money," and she said, "[W]hat money?" Foust threatened to kill her if she did not tell him where the money was, and as a result, she said that she had a dollar and told him where he could find it.

**{¶ 9}** Foust asked Damaris if she was a virgin. Damaris told Foust that she was not, hoping that he would leave her alone. Foust removed Damaris's clothing and tied her hands behind her back. Foust then ordered her to perform oral sex. When she refused, he pointed his knife at her neck and asked her if she wanted her father to live. Damaris then performed oral sex on him.

**{¶ 10}** After this, Foust untied her hands and ordered her to lie on her back. He vaginally raped her multiple times and also touched her breasts and put his fingers on her vagina. She saw his face during these rapes. When he finished, he ordered her not to move and left the bedroom.

**{¶ 11}** Shortly thereafter, Foust returned to the bedroom and vaginally raped her again. Damaris asked why he was "doing this to a Christian," and he replied that if she was a real Christian, she would forgive him. Foust then ordered her to get on her knees and pray out loud for him. While on her knees, Damaris prayed that God would help him realize what he was doing. Foust told Damaris to shut up, put her back on the bed, and raped her again.

**{¶ 12}** After that, Foust took Damaris into her sister's bedroom. Although Foust had placed a shirt over her head, Damaris saw Foust take several things from her sister's room. Foust then forced Damaris into the bathroom and tied her hands and feet together with shoestrings. He then tied Damaris to the bathtub leg with a chain belt, told her not to move, and left the bathroom.

**{¶ 13}** Later, Foust returned to the bathroom and accused her of moving around. He said, "[Y]ou think I'm playing with you," and cut one of her braids off. Foust also touched her vagina with his knife and threatened to slice her open if she moved.

**{¶ 14}** While Damaris was tied up in the bathroom, Foust started fires in Jose's downstairs bedroom and in the upstairs bedrooms of Cheyla and Damaris. Afterwards, he took Jose's car keys, left the house, and drove Jose's car about two blocks, parked it on the street, and walked to a friend's house.

**{¶ 15}** While tied up in the bathroom, Damaris smelled smoke, managed to move the shirt from her face, and saw that the house was on fire. She freed herself by wiggling the belt loose from the bathtub leg. She then crawled into her bedroom, maneuvered herself onto her bed, and let the fire on her mattress burn the shoelaces off her ankles and wrists. Damaris put the fire out in her room and went downstairs to look for her father but could not find him. She then left the smoke-filled house and ran to a neighbor's home for help.

**{¶ 16}** Police and firefighters arriving at the scene found the home engulfed in flames. Jose's body, burned beyond recognition, was found on his bed. Damaris told Patrolman William Hyland that "Kelly" had attacked her and started the fire. Although she was unsure of his last name, she thought it was "Foster or something like that." Hyland noticed that Damaris had shoelaces tied to her wrists.

**{¶ 17}** After the fire was extinguished, police and fire personnel began collecting evidence from the house. Lt. Victor Gill, an arson investigator, determined that the fire had originated in the first-floor bedroom and the two second-floor bedrooms. Investigations revealed two spent matches: one next to a box of matches on the kitchen floor and another on the carpet next to Damaris's bed. Lt. Gill concluded that "there were at least three fires and each [had been] separately and intentionally set."

**{¶ 18}** In the basement, police found Foust's left thumbprint on a water pipe near the basement window. During a search of the house on April 6, 2001, police found a claw hammer underneath Damaris's bed.

**{¶ 19}** After identifying Foust as the primary suspect, police began searching for him. On April 7, 2001, the police arrested Foust, and around 10:30 a.m., Detectives Denise Kovach and Michael Cipo interviewed Foust at the police station. After waiving his *Miranda* rights, Foust confessed to breaking into the home, hitting Jose, and raping Damaris. However, Foust claimed that he "didn't

intentionally want to do any harm" and said, "I really don't know what I was doing, just trying to find out where Janita [sic, Janira] was."

{¶ 20} At trial, Julie Heinig, a DNA analyst, testified that a preliminary examination of the hammer revealed blood on the hammer claw. According to Heinig, "The DNA profile obtained from the blood on the hammer matched the DNA profile of Jose Coreano." The handle of the hammer was also tested and revealed a DNA mixture to which Foust could not be excluded as a contributor.

{¶ 21} Joseph Serowik, a scientific examiner for the Cleveland Police Department, examined a rape kit containing blood, hair, and swab samples obtained from Damaris. Examination of the vaginal swab sample revealed sperm cells and seminal fluid. Testing of rectal swabs showed the presence of seminal fluid and blood. Due to administrative problems at the lab, however, DNA testing was not conducted on this evidence.

{¶ 22} Dr. William Bligh-Glover, a deputy coroner for Cuyahoga County, performed an autopsy on Jose Coreano and concluded that Jose had fourth-degree burns over 100 percent of his body and had "suffered blunt force trauma to his head with soft tissue skull and brain injuries." He further testified that the hammer found in Damaris's bedroom could have caused the circular fracture on Jose's skull. Dr. Bligh-Glover concluded that Jose's death was caused by the blunt impact to the head and that the burns occurred after death. He reached this conclusion because no carbon monoxide had been found in Jose's blood, and high levels of carbon monoxide would normally be found in the blood of a person who had died from smoke inhalation. Also, he found no soot in Jose's lungs.

{¶ 23} The defense presented no evidence during the guilt phase of trial.

### Trial result

{¶ 24} The state charged Foust with one count of aggravated murder, alleging he had caused Coreano's death with prior calculation and design, five counts of aggravated murder, alleging he had caused Coreano's death while

committing a felony, and 20 related felony counts. Foust waived his right to a jury trial, and a three-judge panel heard his case. He pleaded not guilty to all charges. The following chart summarizes the charges and the court's findings and sentence:

| Count | Specifications | Verdicts (count and specifications) | Sentence |
|---|---|---|---|
| 1. Aggravated murder of Coreano (murder committed with prior calculation and design) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Not guilty of aggravated murder; guilty of lesser included offense of murder | 15 years to life |
| 2. Aggravated murder of Coreano (felony murder— aggravated burglary) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Guilty | Death |
| 3. Aggravated murder of Coreano (felony murder— aggravated robbery) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Guilty | |
| 4. Aggravated murder of Coreano (felony murder— kidnapping) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Guilty | |

| | | | |
|---|---|---|---|
| 5. Aggravated murder of Coreano (felony murder—rape) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Guilty | |
| 6. Aggravated murder of Coreano (felony murder—aggravated arson) | R.C. 2929.04(A)(5), course of conduct, and five (A)(7) specifications: aggravated burglary, aggravated robbery, kidnapping, rape, and aggravated arson | Guilty | |
| 7. Attempted murder of Damaris Coreano | | Guilty | 10 years |
| 8. Aggravated burglary | | Guilty | 10 years |
| 9. Aggravated robbery | | Not Guilty | |
| 10. Aggravated robbery | | Guilty | 10 years |
| 11. Kidnapping (Damaris Coreano) | | Guilty | 10 years * |
| 12. Rape (Damaris Coreano) | | Guilty | 10 years ** |
| 13. Rape (Damaris Coreano) | | Guilty | 10 years ** |
| 14. Rape (Damaris Coreano) | | Guilty | 10 years ** |
| 15. Rape (Damaris Coreano) | | Guilty | 10 years ** |
| 16. Rape (Damaris Coreano) | | Guilty | 10 years ** |
| 17. Rape (Damaris Coreano) | | Not Guilty | |
| 18. Rape (Damaris Coreano) | | Not Guilty | |

| | | | |
|---|---|---|---|
| 19. Rape (Damaris Coreano) | | Not Guilty | |
| 20. Gross sexual imposition (Damaris Coreano) | | Guilty | 1 year ** |
| 21. Gross sexual imposition (Damaris Coreano) | | Guilty | 1 year ** |
| 22. Gross sexual imposition (Damaris Coreano) | | Guilty | 1 year ** |
| 23. Aggravated arson (risk of harm to Jose Coreano) | | Not Guilty | |
| 24. Aggravated arson (risk of harm to Damaris Coreano) | | Guilty | 10 years |
| 25. Aggravated arson (risk of harm to fireman) | | Not Guilty | |
| 26. Aggravated arson (physical harm to occupied dwelling) | | Guilty | 10 years |
| Various sexual-motivation and sexual-predator specifications | | Not Guilty | |
| * Sentence for kidnapping (Count 11) to be served consecutively with sentences for rape (Counts 12-16), gross sexual imposition (Counts 20-22), and attempted murder (Count 7). | | | |
| ** Sentences for rape (Counts 12-16) and gross sexual imposition (Counts 20-22) to be served concurrently with one another. | | | |

{¶ 25} Foust now appeals to this court as a matter of right.

### Pretrial issues

{¶ 26} *Missing elements in the indictment*.  In proposition of law II, Foust argues that the indictment is defective because the felony-murder counts

8

and the R.C. 2929.04(A)(7) specifications do not set forth every element of the charged offenses.[1]  Foust also claims that his indictment for aggravated burglary in Count 8 is defective because the count fails to specify the offense that Foust intended to commit inside the house.

{¶ 27} Foust never challenged the sufficiency of the indictment before or during trial.  Under Crim.R. 12(C), "[d]efenses and objections based on defects in the indictment" must be raised before trial.  As stated in Crim.R. 12(H), "[f]ailure by the defendant to raise defenses or objections" within the time required "shall constitute waiver of the defenses or objections," although the court may grant relief from the waiver.  Accord *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 364 N.E.2d 1364; *State v. Carter* (2000), 89 Ohio St.3d 593, 598, 734 N.E.2d 345.

{¶ 28} No reason exists to grant Foust relief from his failure to object.  In fact, no deficiency in the indictment exists.  Under Crim.R. 7(B), an indictment "may be made in ordinary and concise language without technical averments or allegations not essential to be proved.  The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged."  See, also, *State v. Childs* (2000), 88 Ohio St.3d 558, 564, 728 N.E.2d 379.

{¶ 29} **Felony-murder counts**.  The indictment language for the aggravated felony-murder counts follows the wording of R.C. 2903.01(B), the felony-murder provisions of the aggravated-murder statute.  Thus, these counts were properly worded in the indictment.  See *State v. Murphy* (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; *State v. Landrum* (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710.  Moreover, the indictment included separate counts for the

---

1. Foust concedes that the R.C. 2929.04(A)(5) course-of-conduct specifications are correctly

underlying felonies – Counts 8 through 19 and Counts 23 through 26 – and these counts set forth the elements for these offenses. Reading the felony-murder counts in pari materia with the related felony counts provided ample notification of the elements of the underlying felonies—aggravated burglary, aggravated robbery, rape, kidnapping, and aggravated arson—that the state had to prove. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 197, 616 N.E.2d 909.

{¶ 30} **R.C. 2929.04 specifications**. R.C. 2941.14(C) governs the form of death-penalty specifications in indictments and provides that "[t]he aggravating circumstance may be stated in the words of the subdivision in which it appears or in words sufficient to give the accused notice of the same." Here, the R.C. 2929.04(A)(7) specifications in the indictment tracked the language of R.C. 2929.04(A)(7), and each of the specifications named the underlying felonies that Foust allegedly committed. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 456, 653 N.E.2d 285 (R.C. 2941.14[C] "clearly provides that the specification is sufficient if the accused knows which subsection, or which aggravating circumstance * * * listed in R.C. 2929.04[A] has been alleged"). Thus, we find no defect in the R.C. 2929.04(A)(7) specifications.

{¶ 31} **Aggravated-burglary count**. The state also correctly presented the aggravated-burglary charge in the indictment—Count 8. The wording of the indictment tracked the language for aggravated burglary in R.C. 2911.11 and did not need to allege the particular felony that Foust had intended to commit. See *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000; *State v. Waszily* (1995), 105 Ohio App.3d 510, 516, 664 N.E.2d 600, abrogated in part on other grounds by *State v. Fontes* (2000), 87 Ohio St.3d 527, 721 N.E.2d 1037.

{¶ 32} We also reject Foust's constitutional arguments. An indictment meets constitutional requirements if it, "first, contains the elements of the offense

charged in the indictment.

10

charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. * * * 'Undoubtedly *the language of the statute may be used* in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.' " (Emphasis added.) *Hamling v. United States* (1974), 418 U.S. 87, 117-118, 94 S.Ct. 2887, 41 L.Ed.2d 590, quoting *United States v. Hess* (1888), 124 U.S. 483, 487, 8 S.Ct. 571, 31 L.Ed. 516. Review of Foust's indictment shows that the aggravated-murder counts, the R.C. 2929.04(A)(7) specifications, and the aggravated-burglary count met these criteria.

{¶ 33} Nevertheless, Foust argues that *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, require that every element of an offense be set forth in the indictment. In *Apprendi*, the Supreme Court held that the Sixth Amendment does not permit a defendant to be "expose[d] * * * to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." (Emphasis sic.) Id. at 483, 120 S.Ct. 2348, 147 L.Ed.2d 435. In *Ring*, a capital case, the Supreme Court held that a trial judge may not make findings of fact on an aggravating circumstance necessary to impose the death penalty, as this determination is within the province of the jury. *Ring*, 536 U.S. at 609, 122 S.Ct. 2428, 153 L.Ed.2d 556. However, neither case stands for the proposition that there is a constitutional requirement that every element of a criminal offense must be set forth in an indictment.

{¶ 34} Foust also argues – citing *Esparza v. Mitchell* (C.A.6, 2002), 310 F.3d 414 – that an indictment of a capital specification must include all the essential elements necessary to establish the specification. In *Esparza*, the grand jury returned an indictment on an R.C. 2929.04(A)(7) specification that failed to

allege that he was the principal offender or, if not the principal offender, that he had acted with prior calculation and design. However, in *Mitchell v. Esparza* (2003), 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263, the Supreme Court held that the failure to allege that the defendant acted as the principal offender did not constitute a fatal error.

{¶ 35} Based on the foregoing, we reject Foust's argument that there is a constitutional requirement that the indictment specify every element of the offense in either the felony-murder counts or the R.C. 2929.04(A)(7) specifications.

{¶ 36} Finally, Foust has not shown that he was prejudiced in the defense of his case or that he would have proceeded differently if each of the felony-murder counts, the R.C. 2929.04(A)(7) specifications, and the aggravated-burglary count had been worded differently. See *State v. Joseph*, 73 Ohio St.3d at 457, 653 N.E.2d 285.

{¶ 37} In summary, we find that the issue was waived and there was no plain error because the wording of the felony-murder counts, the R.C. 2929.04(A)(7) specifications, and the aggravated-burglary count in the indictment were not defective. Thus, we overrule proposition II.

{¶ 38} *Jury waiver*. In proposition of law I, Foust contends that his waiver of a jury trial was not voluntary and intelligent, and was hence invalid, because the trial court did not inform him that (1) if he was tried by a jury and found guilty of a capital crime, the jury would recommend his sentence, (2) a jury's vote for a death sentence must be unanimous, and (3) the waiver would be valid for both the guilt phase and the penalty phase of trial.

{¶ 39} Foust signed a jury waiver, which was filed and journalized and is in the record. The written waiver contains the following acknowledgment: "I, Kelly Foust, the defendant in the above cause, hereby voluntarily and knowingly waive and relinquish my right to a trial by jury, and elect to be tried by a panel of

three judges of the court in which said cause may be pending. I fully understand that under the laws of this state I have a constitutional right to a trial by jury."

{¶ 40} After Foust signed the jury waiver, the trial court conducted the following colloquy with him:

{¶ 41} "The Court: Mr. Foust, this is your signature on this jury waiver; correct?

{¶ 42} "The Defendant: Yes, sir.

{¶ 43} "The Court: Okay. Your attorneys have advised you that you have a right to a jury of 12 men and women; correct?

{¶ 44} "The Defendant: Yes, sir.

{¶ 45} "The Court: And obviously, then, they advised you that you can waive that right and have your case tried by three judges instead of a jury. You understand that, sir?

{¶ 46} "The Defendant: Yes, sir.

{¶ 47} "The Court: Okay. Did anybody put any pressure on you to give up your jury right and have this tried by three judges instead of a jury?

{¶ 48} "The Defendant: No.

{¶ 49} "The Court: Okay. Was this your own free-will decision to do that?

{¶ 50} "The Defendant: Yes."

{¶ 51} Following this colloquy, the trial court found that Foust's waiver was knowingly, intelligently, and voluntarily made.

{¶ 52} A jury waiver must be voluntary, knowing, and intelligent. *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 375 N.E.2d 1250. Waiver may not be presumed from a silent record. However, if the record shows a jury waiver, the conviction will not be set aside except on a plain showing that the defendant's waiver was not freely and intelligently made. *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37, citing *Adams v. United*

*States ex rel. McCann* (1942), 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268. Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *United States v. Sammons* (C.A.6, 1990), 918 F.2d 592, 597; *State v. Bays* (1999), 87 Ohio St.3d 15, 19, 716 N.E.2d 1126.

{¶ 53} Although the trial court did not fully advise Foust of all the implications of his jury waiver, "[t]here is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel. While it may be better practice for the trial judge to enumerate all the possible implications of a waiver of a jury, there is no error in failing to do so." (Citation omitted.) Id. at 26, 559 N.E.2d 464; see, also, *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 26; *State v. Bays*, 87 Ohio St.3d at 20, 716 N.E.2d 1126 (trial court's failure to explain that a single juror can block a death recommendation did not invalidate a jury waiver).

{¶ 54} We also reject Foust's claim that his jury waiver was invalid because the trial court failed to advise him that the waiver applied to both the guilt and the penalty phases of trial. The waiver of the right to trial by jury in a capital case applies to both the guilt phase and the penalty phase of the trial. Contrary to Foust's contentions, the record demonstrates that he knew that his waiver applied to both phases of trial: during a colloquy with counsel after accepting Foust's waiver, the court stated, "[W]e will leave the date for December 12th before a panel of three judges. You should all be aware, in the event any discussions about a plea to reduced charges should be done, that *we still have to convene the three-judge court in order to take that plea and impose a sentence*." (Emphasis added.) Thus, the record reflects that all were aware—including Foust—that his waiver of

a jury trial meant that the three-judge panel would impose sentence during the penalty phase.

{¶ 55} Further, nothing in the record suggests that Foust's jury waiver was not knowingly, intelligently, and voluntarily made. When the trial court accepted Foust's written waiver, Foust affirmed that his decision was voluntary. Moreover, his trial counsel did not request that the trial court ask any further questions or clarify any of the other rights associated with Foust's waiver.

{¶ 56} Based on the foregoing, we overrule proposition I.

{¶ 57} *Admissibility of confession*. In proposition of law IV, Foust argues an inadequate *Miranda* advisement because he asserts police did not advise him that he could request counsel at any time during the interrogation and that police questioning would stop if he requested counsel. Because of this alleged failure, Foust contends that his *Miranda* waiver was not knowingly and intelligently made and thus his confession should not have been admitted into evidence.

{¶ 58} However, Foust did not raise these specific issues in the trial court. Instead, Foust filed a motion to suppress challenging the voluntariness of his confession based on his youth and his being intimidated by police. Because Foust did not attack the adequacy of the *Miranda* warnings before the trial court, he has waived that issue absent plain error. *State v. Peagler* (1996), 76 Ohio St.3d 496, 499-501, 668 N.E.2d 489 (on appeal, a defendant cannot introduce a new basis for a challenge made at trial). Moreover, no plain error exists because the police properly apprised Foust of his *Miranda* rights.

{¶ 59} The record reveals that on April 7, 2001, the police arrested Foust, and, at that time, Detective Frank Costanzo advised Foust of his *Miranda* rights. Foust stated that he understood those rights.

{¶ 60} Around 10:00 a.m. on April 7, at the police station, Detectives Michael Cipo and Denise Kovach interviewed Foust. Before the interview,

Detective Cipo again advised Foust of his *Miranda* rights. Using an advisement-of-rights card issued by the police department, Detective Cipo advised Foust:

**{¶ 61}** "You have a right to remain silent. Anything you say can and will be used against you in Court. You have a right to consult with a lawyer before answering any questions and to have a lawyer with you during any questioning. If you cannot afford a lawyer, one will be provided for you free of cost."

**{¶ 62}** According to Detective Cipo, there was also a large placard with these same warnings posted on the wall in the interview room. After being advised of his *Miranda* rights, Foust said that he understood his rights and did not need a lawyer, and then he talked with the police and confessed to the crimes.

**{¶ 63}** After his oral confession, Foust agreed to provide a written statement. After the written statement was prepared, but before Foust signed it, Detective Kovach again read Foust his *Miranda* rights, using the preprinted advisement of rights on the first page of the statement. Detective Kovach advised Foust:

**{¶ 64}** "Before making any written statement that may be used against you at the time of your trial, we wish to repeat the instructions issued prior to oral interrogation; that you have the right to counsel, appointed or retained, before interrogation, that you have the right to remain silent, and that anything you say may be used against you. You have the right to have an attorney present while making this statement."

**{¶ 65}** Following this advisement of rights, Foust was asked, "Do you understand your rights as stated above?" and "Do you care to make any written statement?" Foust answered yes to both questions, marked his agreement on the form, and signed his name underneath the advisement of rights. Foust then signed each page of his written statement. On the last page of his statement, Foust answered no to the question "Did anyone threaten you or promise you anything to make this statement?" He answered yes to the question "Having read your

statement, do you find it to be true?" Foust then signed the last page of his confession.

**{¶ 66} Adequacy of the *Miranda* warnings**. Foust claims that the police provided him inadequate *Miranda* warnings because they did not tell him he could ask for an attorney at any time, including after the questioning began, and that if he asked for an attorney once the questioning had started, all questioning would stop.

**{¶ 67}** *Miranda v. Arizona* (1966), 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694, requires that before questioning a suspect in custody, law-enforcement officials must inform the suspect (1) that he or she has the right to remain silent, (2) that his or her statements may be used against him or her at trial, (3) that he or she has the right to have an attorney present during questioning, and (4) that if he or she cannot afford an attorney, one will be appointed.

**{¶ 68}** The Supreme Court has never insisted that *Miranda* warnings be given in the exact form described in that decision. Instead, the court has stated that " 'the "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' and that 'no talismanic incantation [is] required to satisfy its strictures.' " *Duckworth v. Eagan* (1989), 492 U.S. 195, 202-203, 109 S.Ct. 2875, 106 L.Ed.2d 166, quoting *California v. Prysock* (1981), 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696. "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " *Duckworth* at 203, 109 S.Ct. 2875, 106 L.Ed.2d 166, quoting *Prysock* at 361, 101 S.Ct. 2806, 69 L.Ed.2d 696.

**{¶ 69}** Police do not have to provide additional warnings to a suspect beyond what *Miranda* requires. Indeed, in *State v. Edwards* (1976), 49 Ohio St.2d 31, 39-41, 3 O.O.3d 18, 358 N.E.2d 1051, we found that *Miranda* warnings were adequate even though the defendant was not explicitly asked whether he

wanted an attorney. Similarly, in *State v. Dailey* (1990), 53 Ohio St.3d 88, 90-91, 559 N.E.2d 459, *Miranda* warnings were deemed adequate even though they did not explicitly refer to "appointment of counsel."

{¶ 70} Federal courts have also rejected challenges to the adequacy of *Miranda* warnings based on the absence of additional warnings. See, e.g., *United States v. Ricks* (C.A.6, 1993), 989 F.2d 501, unpublished opinion, 1993 WL 78781 (suspect need not be informed that he has the right to stop answering questions at any time); *United States v. Lares-Valdez* (C.A.9, 1991), 939 F.2d 688 (suspect need not be advised of the right to have questioning stopped at any time, of the option to answer some questions but not others, or that some questions may call for incriminating responses); *United States v. Caldwell* (C.A.8, 1992), 954 F.2d 496, 501-504 (suspect need not be explicitly advised of his right to counsel before and during questioning); *United States v. DiGiacomo* (C.A.10, 1978), 579 F.2d 1211, 1214 (no express requirement under *Miranda* to advise suspects of the right to terminate questioning).

{¶ 71} In this case, the police fully advised Foust of his rights as required by *Miranda*. Foust was advised of (1) his right to remain silent (and was warned that any statement he made could and would be used against him in court), (2) his right to have a lawyer present prior to and during interrogation, and (3) his right to have a lawyer appointed at no cost if he could not afford one. However, police were not required to also advise Foust of his right to ask for a lawyer and stop questioning at any time after the interrogation was underway. Indeed, "[t]here are numerous circumstances and ways in which the right to silence may be invoked and officers could not possibly warn of all of them. Having advised of the essential rights, the officers are not obliged to warn of any or all of the circumstances or manners in which the right may be invoked." *United States v. Alba* (D.Conn.1990), 732 F.Supp. 306, 310. Moreover, when he was advised of

his *Miranda* rights, Foust never asked for a further explanation of them. Thus, the *Miranda* warnings Foust received were proper.

{¶ 72} **Voluntariness**. The "totality of the circumstances" surrounding Foust's confession also shows that Foust voluntarily waived his *Miranda* rights and that his confession was knowingly, intelligently, and voluntarily made. See *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410. First, the police never subjected Foust to threats or physical abuse or deprived him of food, sleep, or medical treatment. Nor did the police make any promises to Foust in return for his cooperation. Foust was in police custody for only two and one-half hours prior to being interviewed. Furthermore, the interview lasted only two hours.

{¶ 73} Second, Foust appeared to be mentally alert and not under the influence of drugs or alcohol at the time of the interview. During the police interview, Foust stated that he had completed a GED course and had the highest score in his class. Thus, we find no evidence of police coercion or overreaching showing that Foust's confession was involuntary. See *State v. Eley* (1996), 77 Ohio St.3d 174, 178-179, 672 N.E.2d 640.

{¶ 74} Based on the foregoing, we overrule proposition IV.

*Guilt-phase issues*

{¶ 75} *Ineffective assistance of counsel*. In proposition of law III, Foust argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 76} **Failure to challenge Heinig's expert qualifications**. Foust argues that his counsel provided ineffective assistance by failing to object to Julie

Heinig's testifying as a DNA expert. Heinig, a forensic DNA analyst with the Cuyahoga County Coroner's Office, conducted DNA analysis of blood found on the suspected murder weapon, the hammer found underneath Damaris's bed. Heinig testified that DNA from the blood matched the DNA of Jose Coreano. She also testified that a DNA analysis of a swab used to collect matter from the hammer's handle showed a "mixture" of DNA from more than one person and that Foust's DNA profile was "visible" within this mixture.

{¶ 77} Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman* (2001), 93 Ohio St.3d 274, 285, 754 N.E.2d 1150; *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 78} Contrary to Foust's assertions, Heinig qualified to testify as an expert in DNA analysis. She holds a bachelor of science degree in biology, a master's degree in zoology, and a Ph.D. degree in anatomy and cell biology. Heinig also received six months of training on various testing procedures involving DNA analysis and has testified as a DNA expert on other occasions. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 32 (Heinig testified that the defendant's DNA was found in the getaway vehicle); *State v. Fluellen*, Cuyahoga App. No. 78532, 2002-Ohio-3262, 2002 WL 1397128, ¶ 14 (Heinig found "well-qualified to serve as an expert in the area of forensic DNA analysis"). Thus, Heinig possessed the necessary qualifications to provide expert testimony at Foust's trial.

**{¶ 79}** Given the strong presumption that counsel's performance constituted reasonable assistance, we find that his defense counsel were not ineffective for failing to challenge Heinig's qualifications as an expert witness. See *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 51; *State v. Hartman*, 93 Ohio St.3d at 297, 754 N.E.2d 1150.

**{¶ 80} Failure to object to Heinig's testimony**. Foust contends that his counsel provided ineffective assistance by failing to object to Heinig's testimony because she allegedly did not adequately establish the scientific method used to conduct DNA testing of the hammer. Heinig testified that DNA material from the hammer was tested using the Short Tandem Repeat ("STR") method. Heinig explained that the STR method examines "13 different regions of DNA" to obtain a person's DNA profile. Using the STR method, Heinig found that "each of the 13 loci" from Foust's DNA was visible in the mixture on the hammer.

**{¶ 81}** Thus, contrary to Foust's claims, Heinig explained the scientific method used in conducting DNA analysis in this case. Moreover, we recognized in *State v. Pierce* (1992), 64 Ohio St.3d 490, 497, 597 N.E.2d 107, that "the theory and procedures used in DNA typing are generally accepted within the scientific community." Accordingly, "the failure to challenge the admissibility of such evidence cannot be considered ineffective assistance of counsel." *State v. Nicholas* (1993), 66 Ohio St.3d 431, 437, 613 N.E.2d 225.

**{¶ 82}** Foust also claims that his counsel provided ineffective assistance by failing to object to Heinig's testimony because she did not actually perform the DNA testing herself. During her direct examination, Heinig said, "For the most part another analyst did the testing and I did the DNA typing at the end of the analysis."

**{¶ 83}** The defense counsel's failure to object to Heinig's testimony as hearsay was a tactical decision. By not objecting to Heinig's testimony, the defense counsel avoided forcing the prosecution to call the other DNA analyst as

a witness. The other DNA analyst would likely have elaborated upon Heinig's findings and bolstered the prosecution's case. Thus, we find that counsel's failure to object to Heinig's testimony did not constitute ineffective assistance. See *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373; cf. *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, at ¶ 51.

{¶ 84} Finally, Foust argues that his counsel provided ineffective assistance by failing to challenge the foundation for Heinig's testimony on the statistical probability that the DNA profile of the blood that matched Jose Coreano's DNA profile would match another person's DNA profile. Heinig testified that the probability that another person's DNA profile would match the DNA profile obtained from the blood on the hammer was one in 140 trillion for southwestern Hispanics, one in 980 trillion for southeastern Hispanics, and one in four quadrillion for Caucasians.

{¶ 85} DNA evidence expressed in terms of population frequency is admissible if it is relevant. Questions regarding the reliability of DNA evidence in a given case, including DNA statistics on population frequency, go to the weight of the evidence rather than its admissibility. See *State v. Pierce*, 64 Ohio St.3d 490, 597 N.E.2d 107, paragraph two of the syllabus. Moreover, expert witnesses are allowed to testify to statistical conclusions about DNA evidence without being experts in statistical analysis. See *State v. Rowe* (Dec. 26, 2001), Hamilton App. No. C-000727, 2001 WL 1887770; *State v. Martin* (Aug. 14, 2000), Brown App. No. CA99-09-026, 2000 WL 1145465. Thus, we find that the defense counsel were not ineffective for failing to object to Heinig's testimony about DNA frequency statistics.

{¶ 86} **Adequacy of cross-examination of Heinig.** Foust asserts ineffective assistance of counsel in their cross-examining of Heinig on her DNA findings.

**{¶ 87}** This court has recognized that " '[t]rial counsel need not cross-examine every witness * * *. The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment.' " *State v. Campbell* (2000), 90 Ohio St.3d 320, 339, 738 N.E.2d 1178, quoting *State v. Otte* (1996), 74 Ohio St.3d 555, 565, 660 N.E.2d 711.

**{¶ 88}** Foust claims that counsel did not properly prepare to cross-examine Heinig, because they did not understand DNA terminology. According to Foust, counsel's inadequacy is exemplified by the following cross-examination question: "Is it possible that at that first stage of his alleles, whatever you're calling it, someone could have a 17, too?"

**{¶ 89}** Foust's claim that his counsel did not understand DNA terminology and rendered ineffective assistance in cross-examining Heinig about her findings is purely speculative. Given the "strong presumption" that counsel's performance constituted reasonable assistance, we reject this allegation. *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373.

**{¶ 90}** Foust also fails to explain how further cross-examination of Heinig would have made a difference in his case. If challenged, Heinig would likely have elaborated on the reliability of DNA testing procedures and clarified her testimony. However, such clarification may not have worked in Foust's favor. Thus, counsel may have decided to forgo further cross-examination to avoid the danger of reiterating the state's evidence and clarifying expert testimony that might not come out in Foust's favor. We find that counsel made a legitimate "tactical decision" and were not ineffective. See *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 121-123.

**{¶ 91} Failure to object to fingerprint evidence.** Foust also claims that his counsel provided ineffective assistance by failing to challenge the reliability of fingerprint evidence or object to testimony that his fingerprint matched the fingerprint found in the basement. Foust also claims that his counsel should have

objected to the admissibility of the lab report based on discovery violations and the report's inadmissibility as a public record.

{¶ 92} At trial, Jill Ryan, a fingerprint examiner with the Cleveland Police Department, testified that Foust's left thumbprint matched a print found on a basement water pipe in the Coreano home.

{¶ 93} Counsel's failure to object to the fingerprint evidence falls within legitimate trial strategy. Foust confessed to entering the Coreano home on the night of the murder through a basement window. Thus, fingerprint evidence of Foust's thumbprint found in the basement is not critical. Furthermore, the reliability of fingerprint evidence is well established. See *State v. Payne*, Franklin App. Nos. 02AP-723 and 02AP-725, 2003-Ohio-4891, 2003 WL 22128810, ¶ 54-55; *State v. Hamilton* (Apr. 12, 2002), Lake App. No. 200-L-003, 2002 WL 549841; see, also, 1 Giannelli & Snyder, Evidence (2d Ed.2001) Section 702.27. Here, then, counsel could have reasonably determined it unwise to challenge fingerprint evidence and unnecessary to object to the lab report. *State v. Hartman*, 93 Ohio St.3d at 300, 754 N.E.2d 1150 (failure to challenge bloodstain evidence was a legitimate trial strategy because the defendant admitted that police would find the victim's blood on his boots). Accordingly, we have concluded that Foust has not demonstrated ineffective assistance of counsel in their failure to challenge fingerprint evidence in this case.

{¶ 94} **Failure to request defense experts**. In addition, Foust argues that his counsel provided ineffective assistance by failing to request funds for a DNA expert, an alcohol- and substance-abuse expert, a fingerprint expert, and an arson expert.

{¶ 95} **DNA expert**. Foust claims that he needed a defense DNA expert to challenge DNA testing procedures, to demonstrate the unreliability of DNA evidence, and to assist counsel in challenging the state's DNA evidence.

{¶ 96} Foust claims that a DNA expert was crucial to his defense because he never admitted striking Coreano with a hammer. Nevertheless, in his confession, Foust admitted "pick[ing] up something by the door and hit[ting Coreano] with it." Moreover, the coroner testified that the circular fracture on the top of Coreano's skull was consistent with Coreano's having been hit by the round striking face of a hammer.

{¶ 97} As an initial matter, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d at 436, 613 N.E.2d 225, citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407. Here, the record reveals that trial counsel's decision to rely on cross-examination appears to have been a legitimate "tactical decision," particularly since the results of defense DNA testing might not have turned out to be favorable to the defense. See *State v. Hartman*, 93 Ohio St.3d at 299, 754 N.E.2d 1150.

{¶ 98} Moreover, Foust's argument that his counsel needed a DNA expert to adequately prepare for trial is purely speculative. Despite Foust's assertions, the record does not establish a deficiency in his counsel's knowledge about DNA terminology and procedures.

{¶ 99} For the foregoing reasons, we reject Foust's claim that his counsel were ineffective by failing to utilize a DNA expert.

{¶ 100} **Alcohol- and substance-abuse expert**. Foust asserts that his counsel should have challenged the constitutionality of R.C. 2901.21(C)[2] and claims that his counsel provided ineffective assistance by failing to retain an alcohol- and substance-abuse expert to challenge the statute. Foust also claims that counsel's failure to present expert testimony on alcohol and substance abuse deprived him of relevant mitigation evidence.

---

2. R.C. 2901.21(C) states: "Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense."

{¶ 101}  In his confession, Foust claimed that he had been drinking beer and wine for a couple of hours before breaking into the Coreano home and was "getting pretty wasted."  He claimed, "I didn't mean to hurt anybody, my mind was just messed up."  Damaris testified that she had smelled alcohol on Foust's breath while he was raping her.

{¶ 102}  Counsel's decision not to challenge the constitutionality of R.C. 2901.21(C) was a legitimate tactical decision.  Cf. *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144 (not ineffective assistance of counsel to forgo challenging the constitutionality of Ohio's death-penalty statute).  Thus, counsel were not ineffective for failing to challenge the constitutionality of R.C. 2901.21(C).  And Foust failed to explain how expert testimony on alcohol and substance abuse would have aided such a challenge.

{¶ 103}  Second, we reject Foust's claim that counsel's failure to call a substance-abuse expert deprived him of mitigating evidence.  Dr. James Karpawich, a clinical psychologist, testified as a mitigation witness, and the defense introduced his written evaluation into evidence.  Dr. Karpawich testified that Foust was diagnosed with "alcohol dependence."  In his written evaluation, Dr. Karpawich's reviewed Foust's history of alcohol and marijuana abuse and mentioned that Foust reported "abusing alcohol heavily around the time of the present offenses."  Thus, the defense presented "alternative devices that * * * fulfill[ed] the same functions as the expert assistance sought."  *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus; *State v. Nields* (2001), 93 Ohio St.3d 6, 12-13, 752 N.E.2d 859.

{¶ 104}  **Fingerprint expert**.  As discussed, counsel were not ineffective for failing to object to the state's fingerprint evidence, because Foust admitted entering the Coreano home through the basement window.  Thus, counsel were not ineffective for failing to obtain a defense expert to contest this evidence.

{¶ 105} **Arson expert**. Foust also claims that his counsel provided ineffective assistance by failing to request a defense arson expert to assist them in challenging the state's arson expert.

{¶ 106} Lt. Victor Gill, a fire investigator, investigated the cause of the fire at the Coreano home. He concluded that there were "at least three fires and each [had been] separately and intentionally set." Investigators located a box of matches and a spent match on the kitchen floor and another spent match on the carpet near the point of origin of the upstairs-bedroom fire. Moreover, Foust confessed that he had been striking matches and "throwing them down" in the house.

{¶ 107} In view of overwhelming evidence that Foust started the fires at the Coreano home, counsel could have determined it unnecessary to hire a defense arson expert to challenge Lt. Gill's findings. Thus, counsel exercised professional judgment in refraining from requesting a defense arson expert. See *State v. Hartman*, 93 Ohio St.3d at 300, 754 N.E.2d 1150. As we have noted, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy* (2001), 91 Ohio St.3d 516, 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 108} Finally, resolving this issue in Foust's favor would be purely speculative. Foust does not indicate how the testimony of a defense arson expert would have made any difference in the outcome of the case.

{¶ 109} **Cumulative error**. Foust argues that even if individually his counsel's errors did not rise to the level of ineffective assistance of counsel, the cumulative effect of those errors necessitates reversal. Foust received a fair trial, no error occurred, and the "cumulative error" argument is rejected. Based on the foregoing, we reject proposition III.

{¶ 110} In proposition of law V, Foust asserts that his counsel provided ineffective assistance by failing to effectively advocate the motion to suppress his

confession. He also claims that counsel were ineffective in that they failed to object to Judge Robert Glickman's presence on the three-judge panel because he had recently served as a prosecutor.

{¶ 111} **Adequacy of the motion to suppress**. In a pretrial motion, defense counsel filed a motion to suppress Foust's confession "on the grounds that Defendant did not knowingly, voluntarily, and intelligently waived [sic] his rights before making such oral statements." During the presentation of the state's evidence on the motion, Detective Michael Cipo testified that Foust was advised of his *Miranda* rights prior to making a statement. Foust then waived his *Miranda* rights and agreed to provide a statement. According to Detective Cipo, Foust did not appear to be under the influence of alcohol or drugs and provided coherent responses to police questioning. Moreover, Foust never informed the police during the interview that he wanted to talk to a lawyer.

{¶ 112} Foust argues that his counsel were deficient in failing to introduce any evidence to support their assertion that he had asked the police to let him speak to an attorney. However, the record supports the voluntary element of Foust's confession. Thus, it would be highly speculative to conclude that other evidence could have been presented to show that Foust's confession was involuntary or that he had asked for a lawyer. See *State v. Hartman*, 93 Ohio St.3d at 299, 754 N.E.2d 1150. Moreover, Foust's contention of ineffective assistance of counsel in not calling him as a witness to support the motion is not well taken. Counsel's decision "fell within the realm of trial strategy." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 121.

{¶ 113} Foust also claims that his counsel were deficient by failing to cross-examine Detective Denise Kovach about the voluntariness of Foust's confession. During the state's case-in-chief, the prosecution introduced Foust's confession through Detective Kovach's testimony. Detective Kovach, who had not testified at the hearing on the motion to suppress, testified that police had

advised Foust of his *Miranda* rights and that he had waived those rights prior to making his confession. At the conclusion of the state's case, defense counsel renewed the motion to suppress the confession, which the court overruled.

{¶ 114} Foust argues that his counsel provided ineffective assistance by failing to ask Detective Kovach during cross-examination whether Foust had requested a lawyer before making his confession. However, Foust's confession was determined to be admissible evidence before Detective Kovach testified. Both Detective Cipo's testimony and Foust's written waiver of his *Miranda* rights had earlier established that Foust had waived his right to a lawyer prior to confessing. Given the strong presumption that counsel's performance constituted reasonable assistance, the decision to forgo further cross-examination on this issue represented a valid "tactical decision." See *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 51; *State v. Hartman*, 93 Ohio St.3d at 297, 754 N.E.2d 1150.

{¶ 115} Finally, it is highly speculative whether further cross-examination of Detective Kovach would have made any difference in the outcome of the reasserted motion to suppress. Indeed, counsel may have decided to forgo further cross-examination of Detective Kovach to avoid eliciting testimony that might not come out in Foust's favor. See *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 123. Moreover, Foust's counsel had no duty to cross-examine Detective Kovach about the voluntariness of Foust's confession solely because they had reasserted the motion to suppress at the end of the state's case.

{¶ 116} **Failure to object to Judge Glickman**. Foust claims that his counsel provided ineffective assistance by failing to object to Judge Glickman's presence on the three-judge panel. Foust also claims counsel deficiency in their failing to consult with him on the record before informing the court that the defense had no objection to Judge Glickman's presence.

{¶ 117} During pretrial motions, the trial court informed the parties that Judge Glickman had recently been appointed to the bench after serving as an assistant Cuyahoga County prosecutor. The trial court stated, "Counsel have advised me that the mere association with Judge Glickman and his prior experience with the Prosecutor's Office * * * would not in and of itself be a matter of concern provided that Judge Glickman had not had any involvement in any prior actions involving Mr. Foust."

{¶ 118} After opening statements, Judge Glickman disclosed his former position as an assistant county prosecutor "assigned to the major trial unit, but at * * * no time * * * ever assigned any case regarding this particular defendant." Further, Judge Glickman stated that he could never recall talking with Mr. Del Balso, the prosecutor, about Foust's case. In response, Foust's trial counsel stated, "We're satisfied that the Court has made a complete inquiry into that situation and we have no objection."

{¶ 119} After the second witness testified, Judge Glickman reiterated that he did not know anything about this particular case from his time at the prosecutor's office but felt he should disclose that he had worked with Dr. Bligh-Glover (the deputy coroner who testified in this case) in previous cases, that he had helped train several members of the coroner's DNA lab – although not Ms. Heinig, and that he had worked with Detectives Cipo and Kovach on a number of homicide cases. Again, Foust's trial counsel agreed that there was "no problem."

{¶ 120} "The prior professional activities of a judge are not grounds for disqualification where the record fails to demonstrate the existence of a relationship or interest that clearly and adversely impacts on a party's ability to obtain a fair and impartial trial." *In re Disqualification of Cross* (1991), 74 Ohio St.3d 1228, 657 N.E.2d 1338. Because Judge Glickman had no prior involvement with Foust's case as a prosecutor, counsel had no basis for objecting to his presence on the three-judge panel. Thus, counsel cannot be deficient for failing to

object to Judge Glickman's presence on the panel or in failing to file an affidavit of disqualification against him. See R.C. 2701.03. Moreover, counsel did not need to consult with Foust on the record about not objecting to Judge Glickman.

{¶ 121} Based on the foregoing, we overrule proposition V.

{¶ 122} In proposition of law VI, Foust argues ineffective assistance of counsel for failing to raise various guilt-phase issues.

{¶ 123} **Failure to cross-examine Serowik**. Foust contends his counsel failed to cross-examine Joseph Serowik, a scientific examiner for the Cleveland Police Department, as to why no DNA analysis was performed on the rape-kit swabs. Serowik testified that he had examined swabbings taken from the victim's oral, rectal, and vaginal cavities. Microscopic examination of the vaginal swab revealed sperm cells and seminal fluid, and testing of the rectal swab showed seminal fluid.

{¶ 124} Serowik testified that "DNA analysis was started," but "due to various issues it was unable to be completed." Serowik explained that DNA analysis was not completed because the senior DNA analyst went on maternity leave on the day the evidence was submitted to the lab. Additionally, the lab was "unable to obtain a reagent necessary for DNA analysis."

{¶ 125} Because Serowik demonstrated why DNA analysis had not been conducted on the swabs, counsel may have concluded it was futile to question further on this issue. Moreover, whether further questioning would have unearthed any useful information is a matter for speculation only. Indeed, the lack of DNA testing on the swabs was more favorable to the defense than the reasons why such tests were not completed – particularly when the reasons involved administrative miscues. Thus, counsel's decision to forgo cross-examination of Serowik on the reasons why the state did not conduct DNA analysis on the swabs constituted a legitimate "tactical decision." See *State v.*

*Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 123; *State v. Campbell*, 90 Ohio St.3d at 339, 738 N.E.2d 1178.

{¶ 126} **Adequacy of cross-examination.** Foust also asserts that his counsel provided ineffective assistance by eliciting testimony concerning other acts that Foust had committed.

{¶ 127} First, Foust complains that counsel elicited information from Damaris that Foust had been physically violent and that Damaris had seen Foust hit Acevedo. During cross-examination, defense counsel asked Damaris whether she had told Acevedo that she should stop going out with Foust. Damaris's response, "He was physically violent," was nonresponsive to counsel's question. Counsel then asked, "Did you see any incidence of that?" and Damaris said, "I seen him hit her."

{¶ 128} This cross-examination of Damaris was intended to demonstrate bias on the part of Damaris because she had expressed her dislike of him before the night of the murder. It is not ineffective assistance to fail to anticipate a nonresponsive answer to some questions. Moreover, "this case was tried to a three-judge panel, which was capable of drawing the correct conclusion" from the evidence. *State v. Frazier* (1991), 61 Ohio St.3d 247, 254, 574 N.E.2d 483; accord *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (judges presumed to know the law and expected to consider only relevant, material, and competent evidence during deliberations).

{¶ 129} Second, Foust complains that his counsel provided ineffective assistance by eliciting from Damaris that her friendship with Acevedo had ended because of Foust's "actions and the things we knew he did." This comment about Foust was a nonresponsive answer to the appropriate question "Where did Janira live at the time that all this came down?" Moreover, Foust did not suffer any prejudice, particularly because a three-judge panel tried the case. *State v. Frazier*, 61 Ohio St.3d at 254, 574 N.E.2d 483.

{¶ 130}  Third, Foust claims that counsel's cross-examination of Damaris improperly elicited Damaris's comment that Foust had mocked her about being a Christian.  This response followed a line of questioning about previous discussions Damaris and Foust had had about religion.  We find that counsel's decision to pursue this line of questioning was a legitimate tactical decision, even though some of Damaris's answers resulted in negative information about Foust. *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 131}  Fourth, Foust argues that his counsel provided ineffective assistance by eliciting testimony that Foust had made sexual advances toward Damaris before the night of the rapes.  Foust asserts that this testimony supplied a motive for the state's case: revenge of a spurned suitor.  However, the record does not support Foust's assertion.  During cross-examination, Damaris testified that Foust had expressed some romantic interest toward her but that Foust knew Damaris did not like him and that she had a boyfriend.

{¶ 132}  Contrary to Foust's claims, Damaris's testimony did not supply a motive for the crimes.  By Foust's own admission, he was looking for Acevedo, not Damaris, on the night of the crimes.  Thus, the "spurned suitor" motive applied to Foust's relationship with Acevedo, not Damaris.  Damaris's testimony does not establish that Foust had a romantic interest in Damaris to support a motive for committing murder.  Counsel cannot be considered ineffective for eliciting such testimony.

{¶ 133}  Fifth, Foust claims that his counsel's cross-examination of Damaris harmed him by eliciting that Foust had "used her to purchase an automobile, to enable [Foust] to drive illegally."  During cross-examination, Damaris stated that she had allowed Foust to buy cars and put them in her name because he had told her she would be able to drive them.  However, Damaris never got to drive these cars.

{¶ 134} Counsel's cross-examination showed that Damaris and Foust knew each other better than she had indicated under direct examination. Moreover, the fact that Damaris was never allowed to drive the cars titled in her name helped establish bias of the witness. Counsel's decision to ask these questions was a reasonable trial strategy and did not constitute ineffective assistance. *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674; *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 135} Sixth, Damaris's comment that she was never told that Foust did not have a license or that it might have been suspended was a nonresponsive comment to one of counsel's questions. Again, this case was presented to a three-judge panel, capable of disregarding nonresponsive comments from the witness. *State v. Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754.

{¶ 136} Finally, Foust claims that counsel's cross-examination of Patrolman William Hyland was ineffective in that it elicited that Foust had once forced Damaris to drink an alcoholic beverage that he often drank and that she had recognized the smell of that beverage on his breath while he raped her. Such testimony was not prejudicial because this case was tried before a three-judge panel. Id.

{¶ 137} **Other acts of alleged ineffective assistance of counsel.** Foust raises other instances of alleged ineffective assistance of counsel, but even if we assume deficient performance by counsel, Foust cannot show prejudice. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. As we discussed in response to proposition I, Foust knowingly, intelligently, and voluntarily waived his right to a jury trial and he suffered no prejudice from his counsel's failure to ensure its validity. Moreover, Foust was not prejudiced by counsel's failure to object to the indictment (see discussion corresponding to proposition II) or by his counsel's failure to consult with him on the record before waiving any objection to Judge Glickman's presence on the panel (proposition V).

Foust was also not prejudiced by his counsel's decision not to challenge the constitutionality of R.C. 2901.21(C) (proposition III), or by his counsel's failure to request merger of the offenses of rape, kidnapping, and gross sexual imposition (proposition VII).

{¶ 138}  Based on the foregoing, we reject proposition VI.

{¶ 139}  *Allied offenses*.  In proposition of law VII, Foust argues that his separate convictions for kidnapping, rape, and gross sexual imposition violate the Double Jeopardy Clause because the offenses are "allied offenses of similar import" under R.C. 2941.25.[3]  Foust asserts that the state failed to prove separate animus for these offenses and that they should have been merged into a single offense.  However, the defense failed to raise this issue at trial and thus waived all but plain error.  See *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Comen* (1990), 50 Ohio St.3d 206, 211, 553 N.E.2d 640.

{¶ 140}  **Kidnapping and Rape**.  The test for determining whether kidnapping and rape were committed with a separate animus as to each is "whether the restraint or movement of the victim is *merely incidental* to a separate underlying crime or, instead, whether it has a significance independent of the other offense."  (Emphasis added.)  *State v. Logan* (1979), 60 Ohio St.2d 126, 135, 14 O.O.3d 373, 397 N.E.2d 1345.  Moreover, "[w]here the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions."  Id. at subparagraph (b) of the syllabus.

---

3. R.C. 2941.25(A) provides, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment * * * may contain counts for all such offenses, but the defendant may be convicted of only one."

{¶ 141} In *Logan* and subsequent cases, we held that prolonged movement, secretive confinement, or substantial movement of the victim are facts that establish a separate animus for kidnapping. Id. at subparagraph (a) of the syllabus; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 134.

{¶ 142} Here, the facts showed substantial movement and restraint as Foust forced Damaris into the bathroom after raping her. Foust then tied her hands and feet together and tied her to the leg of the bathtub with a belt. These actions subjected Damaris to a substantial increase in risk of harm because after he chained her to the bathtub, he set the house on fire. Cf. *State v. Hartman*, 93 Ohio St.3d at 280-281, 754 N.E.2d 1150 (separate animus for kidnapping when victim had been tied to a bed, gagged, stabbed 138 times, and strangled and had had her throat slit). Based on these facts, we find that Foust committed kidnapping with an animus separate from the rapes.

{¶ 143} **Gross Sexual Imposition and Rape**. Gross sexual imposition is a lesser included offense of rape. *State v. Johnson* (1988), 36 Ohio St.3d 224, 522 N.E.2d 1082, paragraph one of the syllabus. Consequently, a defendant may not be convicted of both gross sexual imposition and rape when the counts arise out of the same conduct.

{¶ 144} One of the three counts of gross sexual imposition that Foust was found guilty of committing was based upon evidence that Foust touched Damaris's vagina with his knife. Damaris testified that Foust left the bathroom after he tied her to the leg of the bathtub. However, he returned to the bathroom after hearing Damaris move around. According to Damaris, Foust cut off one of her braids, touched her vagina with a knife, and threatened to slice her open if she moved. This constitutes conduct separate and distinct from rape. Under these facts, the crimes of gross sexual imposition differ from rape, and, therefore, Foust could be convicted of each.

{¶ 145} The two other counts of gross sexual imposition are premised on Damaris's testimony that Foust had touched her breasts and put his fingers on her vagina. There is no evidence that Foust committed these acts while he was raping Damaris. We conclude that these acts were distinct and separate from each other and from the rapes, and, therefore, Foust could be convicted of each in addition to the rapes.

{¶ 146} Based on the foregoing, we overrule proposition VII.

### *Penalty-phase issues*

{¶ 147} In proposition of law VIII, Foust argues that his counsel provided ineffective assistance of counsel during the penalty phase.

{¶ 148} **Failure to develop Dr. Karpawich's testimony**. Foust claims that his counsel were deficient in failing to develop Dr. Karpawich's testimony to show that Foust suffered from a mental disease or defect that qualified as an R.C. 2929.04(B)(3) mitigating factor. Foust claims that his counsel were obligated to present such testimony because counsel had "indicated" in opening statement that "mitigation was based in part upon R.C. §2929.04(B)(3)."

{¶ 149} R.C. 2929.04(B)(3) applies when "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

{¶ 150} Dr. Karpawich testified that Foust suffered from a major depressive disorder and alcohol dependence. Additionally, Dr. Karpawich's conclusions were included in his written evaluation that was introduced into evidence. Counsel's questioning of Dr. Karpawich addressed the mitigating features of Foust's mental illnesses as follows:

{¶ 151} "Q: And your interviews with Kelly Foust in the jail since you've had a chance to meet with him and the information that you obtained by

way of history * * * leads you to believe that that's what he was suffering from and he does suffer from a major depressive disorder; is that correct?

{¶ 152} "A: That is my opinion, yes.

{¶ 153} "Q: How would that affect his ability to conduct his everyday life with respect to making judgments as to the rightness or wrongness of what he's doing or what he's not doing?

{¶ 154} "A: Again, depends on the severity of the depression at any given time, it depends. Unfortunately in this case when depression is mixed with alcohol then someone's judgment is even more significantly impaired. It depends on what other stability he has in his life to cling on to."

{¶ 155} Nevertheless, Foust argues that his counsel provided ineffective assistance by failing to elicit testimony from Dr. Karpawich that Foust lacked the substantial capacity to appreciate the criminality of his conduct and thus failed to trigger the language of R.C. 2929.04(B)(3). Because it is highly speculative whether Dr. Karpawich could have so testified, Foust's counsel were not ineffective by failing to elicit such testimony. See *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 116, 121 (counsel not ineffective for failing to show that the defendant's paranoid schizophrenia qualified as an R.C. 2929.04(B)(3) mitigating factor).

{¶ 156} However, counsel's questioning of Dr. Karpawich established that Foust suffered from a mental illness that qualified as a mitigating factor under the R.C. 2929.04(B)(7) catchall factor. Cf. *State v. Seiber* (1990), 56 Ohio St.3d 4, 9, 564 N.E.2d 408 ("psychological and mental problems, though not qualifying under R.C. 2929.04[B][3], are directly relevant under R.C. 2929.04[B][7]"). Thus, counsel were not ineffective in questioning Dr. Karpawich.

{¶ 157} **Failure to object to the reintroduction of guilt-phase evidence**. Foust asserts that his counsel provided ineffective assistance by failing to object to the reintroduction of all guilt-phase exhibits in the penalty phase.

However, Foust does not specify which exhibits he believed prejudiced him. Nevertheless, counsel were not ineffective by failing to object to this evidence. The reintroduction of evidence from the guilt-phase in the mitigation phase is allowed by R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus; *State v. Jackson* (2001), 92 Ohio St.3d 436, 447, 751 N.E.2d 946.

{¶ 158} Based on the foregoing, we reject proposition VIII.

{¶ 159} *Merger*. In proposition of law IX, Foust argues that the three-judge panel failed to merge the aggravated-murder counts and the duplicative aggravating circumstances prior to sentencing him. He also claims that the trial court considered nonstatutory aggravating factors as part of the course-of-conduct specification.

{¶ 160} Aggravated-murder counts involving the same victim are to be merged for sentencing. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 132; *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902. Here, review of the sentencing journal entry reveals that the three-judge panel imposed a death sentence "as to each of counts 2, 3, 4, 5, and 6," pursuant to each conviction, but obviously considered these counts as merged.

{¶ 161} As to the multiple aggravating circumstances, the rule is that "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. However, in the case at bar, the five R.C. 2929.04(A)(7) aggravating circumstances (rape, kidnapping, aggravated burglary, aggravated robbery, and aggravated arson) are not duplicative because none arose from the same act or indivisible course of conduct as another. Moreover, as discussed in proposition VII, the facts established that Foust, after breaking into the Coreano home, raped

and kidnapped Damaris with a separate animus for each offense. The facts also showed that Foust's theft of property from inside the house, his setting the house on fire, and his theft of Jose's car constituted separate and distinct acts, each committed with a separate animus. See *State v. Jones* (2001), 91 Ohio St.3d 335, 349, 744 N.E.2d 1163.

{¶ 162} Furthermore, the course-of-conduct specification, R.C. 2929.04(A)(5), and the R.C. 2929.04(A)(7) specification need not be merged. The R.C. 2929.04(A)(7) specifications alleged that the aggravated murder of Jose occurred during the course of rape, kidnapping, aggravated burglary, aggravated robbery, and aggravated arson. In contrast, the course-of-conduct specification alleged that Jose's murder was part of a course of conduct in which Foust also attempted to kill Damaris. Thus, the R.C. 2929.04(A)(5) and (A)(7) specifications did not arise from the same course of conduct and are not duplicative. See *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 51-52; *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019; *State v. Frazier*, 61 Ohio St.3d at 256, 574 N.E.2d 483.

{¶ 163} Finally, Foust points out that the panel considered nonstatutory aggravating factors as part of the course-of-conduct specification. In its sentencing opinion, the panel stated, "[T]he killing of Jose Coreano was part of a *course of conduct* that included all the other crimes committed by the defendant that night: the aggravated burglary of the home, rape and gross sexual imposition upon Damaris Coreano, aggravated robbery, and aggravated arson. These are no longer separate crimes, but have been tied together in a Gordian knot of perversity and brutality."

{¶ 164} The R.C. 2929.04(A)(5) specification applies only to "a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." Thus, the panel improperly referred to other felony offenses that Foust committed as part of a course of conduct, an error that we will

correct during our independent review. See *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124.

{¶ 165} Based on the foregoing, proposition IX has some merit but does not result in error sufficient to warrant a reversal or retrial.

{¶ 166} *Sentencing opinion*. In proposition of law X, Foust contends that the sentencing panel failed to adequately address and give weight to mitigating factors presented at trial.

{¶ 167} First, Foust argues that the three-judge panel failed to consider evidence that he suffered from depression and alcohol dependence as a mitigating factor under R.C. 2929.04(B)(7), the catchall provision.

{¶ 168} The sentencing panel evaluated Foust's history of depression and alcohol dependence to determine whether it qualified as a mental disease or defect under R.C. 2929.04(B)(3). The panel stated that "the defendant indeed suffers from a mental disease or defect (depression and alcohol dependence). The report and testimony of Dr. Karpawich confirm earlier diagnoses to this effect, and Dr. Karpawich's testimony further suggests that these conditions may have played a role in the defendant's conduct on the night of March 31, 2001." Nevertheless, the panel concluded that no evidence established that these conditions affected Foust's " 'capacity to appreciate the criminality of [his] conduct or to conform [that] conduct to the requirements of the law.' " Panel opinion, quoting R.C. 2929.04(B)(3).

{¶ 169} The panel erroneously failed to discuss whether Foust's mental illness had any weight as a (B)(7) factor. We consider this factor during our independent review. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶100; *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136.

{¶ 170} Second, Foust argues that the panel did not properly weigh as a mitigating factor the tragic losses of his older brother and younger sister. In the

sentencing opinion, the panel considered evidence that "[t]he defendant's one significant role model, an older brother, was murdered, execution-style" as a possible R.C. 2929.04(B)(7) mitigating factor. However, the panel concluded that "sympathy for the tragic manner in which the defendant lost his older brother and younger sister may help explain his conduct but does not support mitigation of the sentence."

{¶ 171} Examination of the sentencing opinion reveals that the panel considered the tragic deaths of Foust's brother and sister as mitigating evidence but chose to give it no weight. "There is 'no requirement' that the trial court 'explain how it decides how much weight to give any one factor.' " Moreover, '[t]he weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker.' " *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 81, quoting *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 245, 714 N.E.2d 867. Thus, the panel could reasonably assign whatever weight, if any, it deemed appropriate for that mitigating evidence. Accordingly, we reject proposition X.

### *Cumulative errors*

{¶ 172} In proposition of law XI, Foust contends that errors, individually and collectively, deprived him of a fair trial and necessitate the reversal of his death sentence. However, our review of the evidence shows that Foust received a fair trial. Any error was nonprejudicial. We reject proposition XI.

### *Settled issues*

{¶ 173} *Proportionality*. In proposition of law XII, Foust challenges the constitutionality of Ohio's proportionality review. However, we summarily reject these arguments. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 174} *Constitutionality*. In proposition of law XIII, Foust attacks the constitutionality of Ohio's death-penalty statutes. We have previously rejected similar claims. See *State v. Carter*, 89 Ohio St.3d at 607, 734 N.E.2d 345; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 175} Foust also argues that Ohio's death-penalty statutes violate international agreements to which the United States is a party. However, we also reject this argument. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643.

## INDEPENDENT SENTENCE EVALUATION

{¶ 176} Having considered Foust's propositions of law, we are required by R.C. 2929.05(A) to independently review Foust's death sentence for appropriateness and proportionality. The evidence at trial established that Foust murdered Jose Coreano and attempted to murder Damaris Coreano as part of a course of conduct involving the purposeful attempt to kill two people, R.C. 2929.04(A)(5). The evidence also established that Foust murdered Jose while committing or attempting to commit aggravated burglary, aggravated robbery, rape, kidnapping, and aggravated arson, R.C. 2929.04(A)(7).

{¶ 177} Against these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Foust presented three mitigation witnesses and personally made an unsworn statement.

{¶ 178} Gary William Foust Sr., the defendant's father, testified that Foust was the sixth oldest of his eight children, that he and his wife, Barbara, frequently argued and fought with each other in front of their children, and that he was an alcoholic. Foust was eight years old when his parents were divorced in 1985. Foust did not do well in school and never graduated from high school.

{¶ 179} In 1987 or 1988, Foust's mother was sent to prison. Thereafter, Foust, who was then 11 years old, and three of his siblings lived with their father.

Because Gary was working, he hired a woman to look after the children. In 1990, Foust's mother was released from prison and assumed custody of the children. Thereafter, Gary lost contact with Foust, and Gary had not seen him since 1990.

{¶ 180} Terence, Foust's brother, was shot and killed when he was 18 or 19 years old. Terence lived with two people who were dealing drugs when he was shot. According to Gary, "the people who executed him went there to execute them two people, [and Terence] just happened to be there." In 1981, Foust's two-year-old sister died from a carbon monoxide leak.

{¶ 181} Barbara Ann Foust, the defendant's mother, testified that Gary had been "very violent" and "very unstable." According to Barbara, Gary treated the children very badly. "[I]f he wasn't hitting, he was screaming, he was threatening, he was ridiculing, berating them. [E]verything they ever did wasn't good, nothing they ever did was okay." Gary often physically abused Barbara, and she went to the hospital several times after he had beaten her. Gary also hit Foust and his brothers with "[h]is fist, whatever he could pick up, [and] he'd kick them."

{¶ 182} Barbara stated that "[u]p until seventh grade [Foust] was my very best child. * * * He was always on the merit roll, always on the honor roll, I don't remember every [sic] having to discipline him." However, in the seventh grade, Foust "just totally changed." According to Barbara, "[h]e wouldn't go to school. When he did he was just there roaming the hall. He'd be out all night. He'd disappear for a day or night on end."

{¶ 183} Foust had had a close relationship with Terence, his older brother. However, Terence was involved in car theft. When Foust was 15 years old, he got into trouble and was sent to the Riverview School for Boys. In 1994, while Foust was at Riverview, Terence was shot and killed. Shortly afterward, Foust tried to kill himself. About a year later, Foust was released from Riverview and moved back in with his mother. However, Foust "very rarely spoke to

44

anyone. You know, he'd go for days coming and going and not speak to anyone in the house."

{¶ 184} Foust's relationship with Acevedo was "very bad on both their parts." According to Barbara, "[w]hen he first started seeing her he was actually living with her at her mother's apartment. And there was some kind of a problem between [Foust] and [Acevedo's] brother so he moved back home and brought her with him." However, Foust and Acevedo were constantly fighting. But Barbara did not "know who hit who the most or who argued the most."

{¶ 185} Barbara said she has been angry with her son since these offenses were committed. However, she hoped that Foust would not receive a death sentence because "we now have the choice of life without parole."

{¶ 186} Dr. James Karpawich, a clinical psychologist, described Foust's upbringing as "very traumatic as well as very chaotic." Foust's family members told Dr. Karpawich that Foust's father had been "physically abusive towards all members of the family. On the other hand, Mr. Foust, Kelly's father, indicated that Kelly's mother was unstable. He also alleged that [she] would have men come into the home when he went to work and that she was committing adultery."

{¶ 187} Because of the lack of stability in the home, Foust never developed a strong sense of security. Foust "experienced violence throughout his upbringing, which has an impact on the way he would interact with other people, especially women." Moreover, Foust lacked positive role models during his formative years. Foust had looked up to his older brother Terence as a role model before he was shot and killed.

{¶ 188} Dr. Karpawich reviewed a report prepared by Dr. Feldsher of the Court Psychiatric Clinic on Foust's mental state. Although the report was not introduced at trial, Dr. Feldsher diagnosed Foust as suffering from a depressive disorder with a secondary diagnosis of alcohol dependence. Dr. Karpawich concurred with the finding that Foust "has a significant problem that qualifies for

alcohol dependence." Moreover, Dr. Karpawich believes that Foust was "suffering from a major depressive disorder at the time since both [Foust] and his family had reported that he had been suffering from depression and suicidal thoughts for several months prior to the offense."

{¶ 189} Intelligence tests indicated that Foust's IQ is "in the average range and he does not have any severe clouded deficits." As reported in Dr. Karpawich's written evaluation, other tests showed that Foust's memory was intact, he had mild problems with his complex reasoning ability, and his reading skills were at the high school level.

{¶ 190} Finally, Dr. Karpawich indicated that Foust has "abided by the rules and regulations since he's been in the Cuyahoga County Jail." Although other inmates have given Foust "a hard time because of the high publicity of the trial, * * * he's been able to maintain his control over his anger." Moreover, "he's not gotten into any violence * * * [and] he's been a very appropriate prisoner."

{¶ 191} **Foust's unsworn statement**. On the date of the offenses, Foust was drinking alcohol with a friend. Foust said that his purpose in going to the Coreano house was to see Acevedo, who "was one of the only individuals that [he] had at the time to talk to or to listen to [him]." According to Foust, "I don't know what exactly triggered everything off, but it was just a lot of unstable emotions and mixed feelings that was going through my head at the time."

{¶ 192} Foust told the Coreano family, "I'd like to just say I'm sorry. It should have never happened." He also said, "I didn't mean to hurt nobody. I wasn't intentionally trying to do harm to anybody. When I went there it had nothing to do with the Coreano family at all, but when I arrived there everything in my mind just changed that one split second." In closing, Foust said, "You know, if there's a way I can change that I would, but I don't think there's, you know, anything within my power that I can actually do to help any of the pain or

change anything that happened. The most I can do is just, you know, tell them that I'm sorry for it and hope that one day * * * maybe they can learn to forgive me for it."

{¶ 193} We find nothing in the nature and circumstances of the offenses to be mitigating. Foust broke into the Coreano home and murdered Jose Coreano while he was sleeping. Foust also repeatedly raped Damaris Coreano, chained her to the leg of the bathtub, and then tried to kill her by setting the house on fire. Furthermore, Foust stole property from inside the house and stole Jose's car in fleeing from the scene.

{¶ 194} Although Foust's character offers nothing in mitigation, we give some weight to his history and background. Foust was raised in a very unstable family environment. His father was an alcoholic, and his mother spent time in prison while Foust was growing up.

{¶ 195} We find that the statutory mitigating factors are generally inapplicable here, including R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), and (B)(6) (offender was accomplice only).

{¶ 196} Foust's mental disorders do not qualify as an R.C. 2929.04(B)(3) factor because there was no testimony that Foust, by reason of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

{¶ 197} We give little weight to the R.C. 2929.04(B)(4) mitigating factor (youth of the offender) because Foust was 23 years old at the time of the offenses. See *State v. Hartman*, 93 Ohio St.3d at 306, 754 N.E.2d 1150; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988; *State v. Ballew* (1996), 76 Ohio St.3d 244, 257, 667 N.E.2d 369.

{¶ 198} The R.C. 2929.04(B)(5) mitigating factor (lack of significant criminal history) is entitled to only some weight because Foust has a prior felony

conviction for receiving stolen property. Foust was also sent to the Riverview School for Boys from September 1992 to February 1995.

{¶ 199} Under the catchall provision, R.C. 2929.04(B)(7), we also give some weight to Foust's mental problems. Foust was diagnosed with "Depressive Disorder" and "a significant problem with Alcohol Dependence." Nevertheless, there was no evidence of any significant connection between Foust's mental disorders and Coreano's murder. Moreover, we have previously rejected the argument that a defendant's alcoholism ought to receive much weight as a mitigating factor. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916.

{¶ 200} We also give some weight as a (B)(7) mitigating factor to evidence suggesting that Foust will adapt well to prison life. *State v. Madrigal*, 87 Ohio St.3d at 397, 721 N.E.2d 52. Additionally, we give weight under (B)(7) to Foust's cooperating with the police after he was arrested. *State v. Mink*, 101 Ohio St. 3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 125.

{¶ 201} Finally, we give weight to Foust's apologies to the victims' family and his expressions of remorse. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 143; but, see, *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (remorse entitled to little weight in mitigation). The evidence does not reveal any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 202} Upon weighing the aggravating circumstances against the mitigating factors, we find that the aggravating circumstances as to Jose Coreano's murder outweigh the mitigating factors beyond a reasonable doubt. Foust murdered Jose Coreano during the course of an aggravated burglary, aggravated robbery, rape, kidnapping, and aggravated arson, which are grave aggravating circumstances. Similarly, his course of conduct in killing Jose and attempting to kill Damaris Coreano is also a serious aggravating circumstance. In

contrast, Foust offered no significant mitigating evidence. Thus, we find that the death penalty is appropriate.

{¶ 203} We also find that the penalty imposed in this case is both appropriate and proportionate when compared to other course-of-conduct murders for which the death penalty was imposed. See *State v. Filiaggi*, 86 Ohio St.3d 230, 714 N.E.2d 867 (one murder and one attempted murder); *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096 (one murder and one attempted murder); *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274 (one murder and two attempted murders).

{¶ 204} The death penalty is also appropriate and proportionate when compared to death sentences approved for other burglary-murder and robbery-murder cases. See *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446; *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017; *State v. Stallings* (2000), 89 Ohio St.3d 280, 731 N.E.2d 159. It is also appropriate and proportionate when compared with the sentence in other kidnapping-murder cases. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133; *State v. Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150; *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369. Additionally, the death penalty is appropriate and proportionate when compared to other rape-murder cases. See *State v. Carter*, 89 Ohio St.3d 593, 734 N.E.2d 345; *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932. Finally, the death penalty is appropriate and proportionate when compared to death sentences approved in other arson-murder cases. See *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26; *State v. Wilson* (1996), 74 Ohio St.3d 381, 659 N.E.2d 292.

### *Conclusion*

{¶ 205} We affirm Foust's convictions and his sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

_____

William D. Mason, Cuyahoga County Prosecuting Attorney, Gail D. Baker, Perry M. Kendall Jr., and Carol M. Skutnik, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and Alan C. Rossman, for appellant.

_____