OPINION
{¶ 1} Defendant-appellant Christopher Griffis appeals his December 10, 2003 conviction in the Licking County Court of Common Pleas on one count of murder. Plaintiffappellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On October 16, 2002, emergency personnel responded to 368 Executive Drive in Licking County due to a child having difficulty breathing. Upon arrival, the child was not breathing on his own, but did have a pulse. The child was transported by Life Flight to Children's hospital, but was later pronounced dead.
 {¶ 3} Appellant was the only adult present at the home at the time the child was injured. He maintains he picked the child up and placed the child on the floor, which resulted in the child sustaining a head injury.
 {¶ 4} Appellant was indicted on one count of murder and one count of involuntary manslaughter. He entered a plea of not guilty to each offense. The matter proceeded to jury trial on December 8, 2003. At trial, both parties introduced medical testimony concerning the injuries sustained by the child.
 {¶ 5} The State presented the testimony of the Licking County Coroner, Dr. Robert Belding, who performed an autopsy of the child. Dr. Belding testified, during his medical examination, he discovered the child suffered a subdural hemorrhage, an arachnoid hemorrhage, hemorrhaging along the optic nerves, as well as hemorrhaging in the small bowel and mesentery. Dr. Belding testified at trial the injuries were not the result of the normal wear and tear of a child's life; rather, they were associated with children who have sustained non-accidental trauma. He stated the injuries were consistent with the child's having been thrown to the floor. As a result, Dr. Belding classified the child's death as a homicide.
 {¶ 6} Appellant's expert, Dr. Charles Johnson, testified the child suffered acceleration/deceleration and impact to his brain with bleeding, edema, and interruption of vital functions to the brain causing death. He testified his diagnosis was consistent with appellant's version of the events.
 {¶ 7} On December 10, 2003, the jury found appellant guilty of murder and the trial court sentenced appellant to the mandatory term of imprisonment dictated by statute.
 {¶ 8} Appellant now appeals his conviction assigning as error:
 {¶ 9} "I. The conviction of the defendant-appellant on [sic] cannot stand as insufficient evidence was introduced to establish every element of the offense charged beyond a reasonable doubt and to thus sustain a conviction.
 {¶ 10} "II. The conviction of the defendant-appellant is against the manifest weight of the evidence.
 {¶ 11} "III. The trial court committed harmful error in refusing to strike the testimony of dr. robert belding as the witness was clearly unqualified to testify as an expert in pathology as it relates to the autopsy of the victim herein."
 I, II {¶ 12} Appellant's first and second assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
 {¶ 13} Appellant argues the jury's verdict is against the manifest weight and sufficiency of the evidence.
 {¶ 14} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held as follows: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 15} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v.Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 16} The jury found appellant guilty of one count of murder, in violation of R.C. 2903.02(B). The statute reads:
 {¶ 17} "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 18} In this matter, appellant's charge was predicated on the underlying offense of felonious assault. R.C. 2903.11 defines the offense as:
 {¶ 19} "(A) No person shall knowingly do either of the following:
 {¶ 20} "(1) Cause serious physical harm to another or to another's unborn;"
 {¶ 21} Specifically, appellant maintains despite evidence of physical harm to the child, the state failed to prove he knowingly caused the harm to the child.
 {¶ 22} At trial, the State introduced the testimony of Detective Robert Huffman. Detective Huffman testified:
 {¶ 23} "A. Again, you know, I confronted him with the fact that what he was telling us was not consistent with what would have caused the injury; asked him to further explain, you know, what transpired, and he — as we talked, his explanation for what happened became more and more violent in nature. He stated that he jerked up — Hunter up out of the loveseat, shook Hunter and then threw Hunter to the floor.
 {¶ 24} "Q. Okay. At some point in time, did you ask him to demonstrate for you what he described to you?
 {¶ 25} "A. Yes. I have a doll that we have that we used in another case that we weighted with rocks so it would simulate the actual weight of the child in that particular case.
 {¶ 26} "Q. What was the weight of that doll, or what is the weight of that doll?
 {¶ 27} "A. 20 pounds.
 {¶ 28} "Q. Okay.
 {¶ 29} "A. I — I obtained that doll from another office, brought it back in, I set up the — the — a chair beside the defendant to simulate the loveseat and positioned the doll in the same areas of the loveseat that he had described that the — that Hunter was sitting in. I then had him tell us or show us exactly what he did, and, again, he picked Hunter up, very abruptly shook Hunter and threw him to the floor. I had him explain to us or show us several times the same thing. He had offered up information that he was yelling at Hunter while this was going on, so during some of the simulations, I had him simulate with his voice how he was yelling at Hunter, what he was saying as he was doing the — his actions. Every time that he reenacted this, he was louder, more violent, just a — an obvious progression.
 {¶ 30} "Q. Okay. As you spoke to him, did you feel than he was being more comfortable talking to you about what had happened?
 {¶ 31} "A. Yes. He — he — there was a point in time where I explained to him that Hunter had passed away. That was the only time that he was any emotion whatsoever, and it was very minimal, started to cry but — but no tears. His voice waivered somewhat, that was about it. Otherwise, his demeanor and his — I don't know, he was pretty much flat line all the way through, about the same all the way through, very precise in what he was telling me or telling us. Not much — not much change in his voice through the whole procedure.
* * *
 {¶ 32} "A. Again, very, very violent, very extreme shaking, and it was obvious that he — he was angry with the child.
 {¶ 33} "Q. Okay. Did he, in fact, tell you that at one point?
 {¶ 34} "A. Yes, he did.
 {¶ 35} "Q. Did he give you a reason as to why he was angry with Hunter?
 {¶ 36} "A. He gave several reasons. He said that — sounded to me more like he was blaming the child; that the child had it in for him from the beginning; that as soon as he would walk in the room, Hunter would start crying, throw fits; that on this particular occasion, when Hunter had defecated in his diaper for the third time, that when he asked Hunter if he had pooped that Hunter immediately threw a fit, even described it as Hunter shaking his fist at him, but made it very clear that — that he and Hunter did not get along.
 {¶ 37} "Q. All right. I've asked you to bring the doll with you that he demonstrated. Is that here today.
 {¶ 38} "A. I assume it is.
 {¶ 39} "MR. ROSSI: Okay. Your Honor, I'd ask that the detective be able to get down from the witness stand and demonstrate to the jury what Mr. Griffis demonstrated to him.
* * *
 {¶ 40} "A. He said that the — that Hunter was sitting in the loveseat in the left-hand corner as he — as you would look at the loveseat, and that he was — he was sitting himself in the center of the loveseat next to Hunter.
* * *
 {¶ 41} "A. Okay. Mr. Griffis was sitting in the chair beside the chair that had the doll in it. He stood up from the chair, he grabbed the doll, shook — grabbed it like that from the chair, shook it and threw it to the floor (indicating)." Tr. at 135-141.
 {¶ 42} In addition, Dr. Belding testified on behalf of the State the child suffered a hemorrhage on the surface of the brain called subdural hemorrhage, and another hemorrhage just beneath this called arachnoid hemorrhage. In addition, Dr. Belding testified he found hemorrhages along the optic nerves, beneath the surface of the small bowel's covering, blood in relationship near the inferior vena cava and mesentery, and in the tongue. Dr. Belding explained the relationship of the injuries to the cause and manner of death:
 {¶ 43} "DR. BELDING: A. Hemorrhage, bleeding, such as I have described, is not the result of the usual wear and tear of a child's existence, of a child's life. If a child falls, say, typical example is a three-foot fall, a child will not have any of these inflicted on the child. You can see retinal hemorrhages in an infant in due part because of the trauma through the birth canal. You can imagine the squeezing that is going on in the process of being delivered. However, these are fundamentally different than the hemorrhages that I found in the retina. In the newborn, they are small, focal, they are in a small area and confined to the area, and they typically clear within a matter of days to perhaps weeks, and there is no subsequent bad result. It's what we could consider normal.
 {¶ 44} "However, these hemorrhages do not in any way represent that benign type of hemorrhage. These are much more severe, much more extensive in the retina, and they are associated with perhaps 80 percent, perhaps 90 percent, of children who have had what we call nonaccidental trauma inflicted on them; that is, who have had serious injury inflicted on them.
 {¶ 45} "Now, in addition, the optic nerve hemorrhage nerve at the base I described being about a fifth of an inch long, this is also associated with serious injury. This is not associated with the usual wear and tear that a child has in its life.
 {¶ 46} "Similarly with a subarachnoid and subdural hemorrhage, this indicates, in my opinion, a serious injury. Now, you can get these as a fall, as part of a fall, so I cannot exclude a fall from subarachnoid and the subdural hemorrhage.
 {¶ 47} "Similarly with the injuries to the tongue, this can be seen in adults who have seizures, who have seizure activity due to an injury to their brain, a focal injury that sets up uncontrolled activity and they bite their tongue. Well, we have no evidence that this infant was — had a history of seizures. It could have been due to having the tongue trapped between the jaws secondary to some injury. It could have been due, I suppose, to the resuscitation during the — by the EM — emergency medical services. I can't say it's not.
 {¶ 48} "The hemorrhage in the mesentery and around the inferior vena cava and small bowel is a different type of injury, that, in my opinion, is caused by blunt impact, a fist, perhaps, a stick perhaps, an automobile, perhaps, blunt impact, a foot, a kick, perhaps, that has compressed the intestinal contents against the back of the wall of the body, basically, mashed this all together with the result that the intestine had on its serosa, the surface of the intestine, also had hemorrhage. Also similar hemorrhage in a strip of tissue that connects the intestine to the back of the wall and the actual inferior vena cava is right against the back of the body wall, so, again, injury on the back wall due to this blunt impact. This — this could not be due to resuscitation. This is a serious injury, in my opinion
 {¶ 49} "Q. Doctor, based upon the collection of all the findings, did you have an opinion as to the cause of death?
 {¶ 50} "A. Yes, because I cannot feel that this — these injuries are due to accident or other natural process, I would feel that this is best described as a homicide.
* * *
 {¶ 51} "Q. Okay. So you were able to rule out accidental and find that it was homicide?
 {¶ 52} "A. In my opinion, yes.
 {¶ 53} "Q. Okay. And what did you determine was the cause of injury?
 {¶ 54} "A. In my opinion, this is blunt impacts. Now, there may be a component as well, shaking, but, in my opinion, the major injuries are caused by blunt impacts.
 {¶ 55} "Q. Okay. Would it be consistent with being thrown to the floor?
 {¶ 56} "A. Most of the injuries I would be comfortable with saying that throwing to the floor would be sufficient. The injuries to the intestine, the mesentery and the retroperitoneum, around the inferior vena cava, it would be hard for me to understand how that would be a simple throw to the floor, so I reserve — I believe that's a blunt impact due to, as I say, foot, a hand, something else." Tr. at 184-187.
 {¶ 57} Based upon the above and our having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we do not find, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice the conviction must be reversed and a new trial ordered. Accordingly, appellant's first and second assignments of error are overruled.
 III {¶ 58} In his third assignment of error, appellant argues the trial court committed harmful error in refusing to strike Dr. Belding's testimony, as he was unqualified to testify as an expert in pathology.
 {¶ 59} Generally, the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage
(1987), 31 Ohio St.3d 173. Therefore, we will not disturb a trial court's evidentiary ruling unless we find a ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.
 {¶ 60} Evidence Rule 702 dictates when a witness may testify as an expert:
 {¶ 61} "A witness may testify as an expert if all of the following apply:
 {¶ 62} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 63} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; * * *"
 {¶ 64} In State v. Foust, the Ohio Supreme Court held:
 {¶ 65} "Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her `specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.' Neither special education nor certification is necessary to confer expert status upon a witness. `The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.'" (2004), 105 Ohio St.3d 137, 150.
 {¶ 66} At the start of Dr. Belding's testimony he stated the following:
 {¶ 67} "A. Okay. I got my medical degree at Wayne State University in 1973. Went to the University of Rochester in Rochester, New York, for pathology residency, which I completed in 1977. Obtained my anatomical pathology and clinical pathology at the time, November of that year. I then went and worked for two years as a general pathologist at Edward Sparrow Hospital in Lansing, Michigan. Wanted a little more in my life, so I went into fellowship in chemical pathology, which is a subspecialty area of clinical pathology. Completed that and obtained my boards in November of 1981, and started work at Ohio Valley Medical Center in Wheeling, West Virginia, as, again, a general pathologist. I was employed there for a couple years, then went as chief of the laboratory to Beckley Veterans Medical Center in Beckley, West Virginia, was there until 1994 and quit. Wanted a little more in life, so I went up to West Virginia University as a visiting fellow. Basically I just said I'd like to get up to date on general pathology in pediatrics, OB/GYN, so I could resume a career as a general pathologist. The subsequent several years I attended various part-time jobs but did not get a current job, so with my youngest daughter going off to college, I decided to go into fellowship into forensic pathology, which I started in July 2001, completed it in 2002. November of 2002 I got my board — my board certification in chemical pathology. I started work in Ohio, Franklin County Coroner's Office July of that year, worked there for slightly over a year until now.
 {¶ 68} "Q. Okay. Now, you've talked about some areas that you worked in, and I want you to take a moment — you've talked about pathology. Just can you give us a general layman's description, if you will, as to what pathology is?
 {¶ 69} "A. Pathology is the study of disease. It's medicine without the patients, in a way, without caring for the patients. It involves being a consultant to the physicians at various medical related questions, performing the interpretations of biopsies, such as an appendix, a skin biopsy, whatever, that's anatomical pathology. Also in anatomical pathology is the autopsy. The autopsy is a surgical procedure, and pathologists are very much concerned with care of the dead, as morticians and preachers are, a teamwork of care of the dead.
 {¶ 70} "When we do an autopsy, we make an incision from the top of the shoulder down to the bottom of the rib cage, it's only a matter of getting exposure, and then continue that incision down to the top of the pelvis, the skin of the abdomen, lower abdomen. The body then — the skin lays open and we can remove all of the organs that we need to in order to do the examination. The brain is removed from an incision slightly behind the top of the head. The skin is retracted. It's very flexible. We remove the top of the head and remove the brain. We can do other special studies as needed, but the important thing is when we're done and we turn the body over to the mortician, they do their work, fluff up the pillow and such, and there's no reason why the family at viewing will know that we did an autopsy.
 {¶ 71} "Now, clinical pathology is testing of things, like blood and urine, any other body fluid that we get, and the administration of laboratory that does this testing.
 {¶ 72} "Chemical pathology is the half of the laboratory that's not involved with blood or blood banking, other areas of the laboratory. It's the serum testing that is done and toxicology as well.
 {¶ 73} "Q. Then you also mentioned forensic pathology?
 {¶ 74} "A. I was going to get to that next. Chemical pathology is a subspecialty, a tiny part of clinical pathology. Forensic pathology is a tiny part, a subspecialty of anatomical pathology. Forensic pathology, we are concerned with the interface, the connection between medicine and the law and legal issues. Our concern is that — the bottom line is the cause and manner of death. The numerous — the numerous diseases that a hospital pathologist will examine in his or her autopsy and record and list is of secondary interest to a forensic pathologist. We are concerned, as I say, with the cause, why is this person dead, and classify it as to a natural death, suicide, a homicide.
 {¶ 75} "Q. Okay. And I believe you indicated you were board certified in the State of Ohio; is that correct?
 {¶ 76} "A. The — when we say board certified, our specialty organization, the American Board of Pathology, have certain standards. They've sat around a table and said this is what a competent pathologist should do, should be able to know in order to do their work. They then create a test which is taken by pathologists in an effort to get board certified. This test is — board certification is a national certification. Each state then has its own requirements for licensure which relate to your background and such, and so I have a national certification in forensic pathology, and I am licensed to practice medicine in the State of Ohio." Tr. at 168-172.
 {¶ 77} Upon review of the above, the trial court did not abuse its discretion in allowing Dr. Belding to testify as an expert, and appellant's third assignment of error is overruled.
 {¶ 78} Appellant's December 10, 2003 conviction on one count of murder in the Licking County Court of Common Pleas is affirmed.
Hoffman, P.J., Wise, J. and Edwards, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant.