[Cite as *State v. Gaona*, 2012-Ohio-3622.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P. J. |
| Plaintiff-Appellee | Hon. Sheila G. Farmer, J.<br>Hon. John W. Wise, J. |
| -vs- | Case No. 11 CA 61 |
| GEORGE GAONA | |
| Defendant-Appellant | O P I N I O N |


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Criminal Appeal from the Court of Common Pleas, Case Nos. 10 CR 598 and 11 CR 103 |
| JUDGMENT: | Affirmed in Part; Reversed in Part and Remanded |
| DATE OF JUDGMENT ENTRY: | August 9, 2012 |


APPEARANCES:

| For Plaintiff-Appellee | For Defendant-Appellant |
|---|---|
| KENNETH W. OSWALT<br>PROSECUTING ATTORNEY<br>20 South Second Street, Fourth Floor<br>Newark, Ohio  43055 | WILLIAM T. CRAMER<br>470 Olde Worthington Road<br>Suite 200<br>Westerville, Ohio  43082 |

*Wise, J.*

{¶1}   Appellant George Gaona appeals his conviction, in the Court of Common Pleas, Licking County, for the aggravated murder of Robert Ebright. Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.

{¶2}   In July 2007, Robert Ebright was retired and living alone in Pataskala, Ohio. He was unmarried and had no children, but he kept busy doing occasional odd jobs and taking care of about twenty dogs, which he rarely left unattended. Toward the end of the month, Ebright's cousin, Ruth Fleming, who often visited him, became concerned that she had not had any contact with him for several weeks, i.e., since shortly after July 4, 2007. Fleming and her husband thereafter drove past Ebright's residence several times, but did not see Ebright's red Ford Ranger pickup truck parked outside as usual.

{¶3}   On July 19, 2007, Ebright went to a Huntington Bank branch in Pataskala and took money from an IRA, leaving with $4,100.00 in cash. He told a couple of representatives of the bank that he planned to buy a truck for a new business. One of the bank employees, Tom Greer, noticed that another individual was with Ebright in his pickup when he arrived at the bank.

{¶4}   Ebright's good friend and former co-worker Rick Blakely spoke with him by telephone on July 20, 2007, while Blakely was commencing a one-week vacation in Myrtle Beach. At that time, Ebright mentioned that he was going to start a tree trimming business and planned to purchase a bucket truck for that purpose with assistance from someone named "George." After Blakely returned from vacation in late July, he tried to call Ebright's cell phone, but his calls kept going to voicemail.

{¶5} Blakely drove by Ebright's residence on August 9, 2007 and saw the Ranger pickup was not there. Blakely saw a number of the dogs outside. Blakely drove by again on August 16, 2007, but this time the dogs were gone. Blakely and his wife contacted Ms. Fleming, Ebright's cousin, and the decision was made to call law enforcement. A sheriff deputy responded and checked the inside and outside of Ebright's residence. One dog was found dead near the garage; it was later determined that the remainder had been taken in by a local animal shelter.

{¶6} Chris May, who maintained an office building on Lancaster Road, next door to Appellant Gaona's residence, recalled being introduced to Ebright by appellant in June or July 2007. May was having work done on the office property and barn that summer, and he was there "quite a bit." At one point, Ebright stopped by appellant's residence, and the two men mentioned to May that they planned to go into the tree business together. Appellant moved from the Lancaster Road property on or about August 1, 2007.

{¶7} Appellant's then-girlfriend was Sandra Holling. She testified at trial under a plea deal wherein the State would consider reducing some of her pending charges. Holling admitted, inter alia, that she had "helped bury [Ebright] and clean up the mess." Tr. at 417. She testified that she had known appellant since they were children living in Texas. They had dated and lived together off and on for about ten years, and were living together in July 2007. Tr. at 417-419. Holling had met some of appellant's neighbors, including Chris May. Tr. at 419-420. Holling also met Ebright through appellant. Appellant told her that he and Ebright were going to open a tree cutting

business. She noticed that whenever Ebright came over to their house on Lancaster Road, he always drove over in a red Ford pickup with a white cap. Tr. at 420-422.

{¶8} Holling claimed that during an argument in July 2007, appellant said that Holling needed "to show him respect" and that he was going to show her what kind of man he was by killing someone. Holling was afraid that he might kill her, so she responded by suggesting that he kill Ebright. Tr. at 423.

{¶9} According to Holling, they planned the killing for about a week, including considering a place to bury the body. Appellant built a homemade silencer by cutting the end off a water bottle, stuffing it with cotton balls, and duct-taping the end. Appellant was going to get Ebright into appellant's garage by asking him to work on a van, and then kill him, roll him up in a tarp, and bury him. Appellant planned to use a silver automatic pistol that he said he got from Ebright. Holling agreed to help appellant move the body. Tr. at 423-433.

{¶10} Evidence at trial included a rental agreement from Paisley Rentals dated July 25, 2007, showing that someone purporting to be George Gaona had attempted to rent a Bobcat loader with a front bucket. However, the rental was never finalized, as the customer needed to provide a credit card number before the Bobcat would be delivered. Tr. at 374-377; State's Ex. 2C1. However, members of a crew from Messina Concrete working on Chris May's barn on Lancaster Road at that time later testified that appellant asked them to dig a hole for him so he could burn some trash. They used their loader to dig a hole in the back, by a cell tower, about five feet wide, eight or nine feet long, and three or four feet deep. Tr. at 384-385, 388-389, 394-395. Some of the crew also recalled appellant showing them a silver or chrome pistol.

{¶11} On the day of the murder, Ebright came over to appellant's residence in the afternoon. Appellant at some point took him out to the garage. But after a while, appellant came inside and told Holling that there were too many people outside, so he was going to get Ebright into the basement to look at some tools, and then kill him. Appellant took Ebright to the basement while Holling waited upstairs. Holling recalled that appellant later told her he had shot Ebright in the back of the head while Ebright was on his knees looking at some items on the floor. Tr. at 468. At some point, appellant came back up without Ebright and told Holling "we got to go." They then drove away in Ebright's truck. Tr. at 434-437.

{¶12} Appellant and Holling drove to a hotel in Columbus and stayed overnight. At the hotel, appellant told her that he shot Ebright three times in the back of the head while he was kneeling on the floor looking at something. Tr. at 438-439, 468. At some point, Holling saw appellant with some money in a bank envelope that he said he had obtained from the glove box in Ebright's truck. Tr. at 437. The manager at the Columbus hotel confirmed that appellant had rented a room for one night on July 23, 2007. Tr. at 401. Appellant invited a friend, Stephanie Perkins, to come over to the hotel. Perkins brought her son and they swam in the hotel pool. The next day appellant and Holling went to Perkins' house and spent a couple of days "partying" there. Appellant had a large amount of money on him. Appellant did not stay the entire time, but came and went. Tr. at 439-440. Perkins later testified that appellant told her that they were in Columbus doing some asphalt work for the owner of the hotel and had gotten a free room in exchange. Perkins remembered that appellant was driving a red pickup truck with a white cap. Tr. at 695-702.

{¶13} When appellant and Holling went home, using Perkins' car, they first stopped by Ebright's house to feed his dogs. They then went to their house in the middle of the night to take care of Ebright's body. They got three tarps from the garage, laid them out on the basement floor, and rolled the body onto them. They tied up the tarps with electrical cords and rope, and dragged the body up the stairs.

{¶14} Appellant pulled Holling's truck up to the house and they pushed the body up into the truck bed. They drove around to the back of the house by a cell tower and put the body into a previously-dug hole in the ground.

{¶15} While appellant covered the body with dirt, Holling went back inside and started cleaning up the concrete-floored basement. Holling swept some debris into the drains and bleached the basement room. Holling asserted it was appellant's idea to use bleach to remove the blood. Appellant burned some of the items, including the broom that Holling had used and some of the carpet pieces that were in the basement. Holling also put some debris, along with three shell casings, into a gray bucket. The bucket was supposed to go outside to be burned, but Holling "forgot about it." Tr. at 441-446, 452-459, 467, 505.

{¶16} Appellant and Holling left Ebright's truck at Perkins' house initially, then picked it up the next day after finishing the clean-up. They thereupon drove Ebright's truck to Texas. Holling did not state what ultimately happened to Ebright's truck, but she claimed that appellant threw the gun and Ebright's cell phone into a lake in Texas. Tr. at 452, 459-461, 467. Furthermore, Perkins testified that after the couple had fled to Texas, appellant called and asked her if anyone had come around asking for "Bob." Tr. at 702-703.

{¶17} After about a week in Texas, Holling took a bus back to Ohio. Perkins picked her up from the bus stop and took her back to the house. At some point, sheriff's deputies came around asking about Ebright. Holling told them that he and appellant were in Dayton doing some tree work. Tr. at 462-463. Holling called appellant and told him about the deputies. At the time, appellant was on a bus heading back to Ohio and was quite upset by the news. When Holling picked him up at the bus stop, they went back to the house, packed, rested a little bit, and left for Texas before dawn in Holling's truck. Tr. at 465-467.

{¶18} After they moved to Texas, Holling's sister asked her about a murder that happened in Ohio and showed her a picture of Ebright. Holling broke down and told her sister that appellant had killed someone in Ohio, but denied that it was Ebright at that time. Tr. at 506-508, 523-524.

{¶19} Holling then began cooperating with law enforcement. At the request of law enforcement, Holling engaged appellant in a recorded conversation about the murder, which was later played for the jury. See Exhibit 9-H; Tr. at 468-470. During the conversation, Holling told appellant that the police had come down to Texas to talk with her. Appellant expressed concerns about what she would tell them and about whether she would testify against him. Tr. at 468-470. Holling suggested that she could tell the police that Ebright was trying to hurt her when appellant killed him. Tr. at 470. Holling also told appellant that she did not think she cleaned up properly, in reference to the gray bucket with the shell casings that was left in the basement. Tr. at 471. Appellant never denied shooting Ebright in these recorded conversations. Tr. at 472. Holling interpreted some of what appellant said to mean that she should stay quiet. Tr. at 482.

Holling told appellant that she told her mother that he killed Ebright, and that her mother had told the police. Appellant got mad and walked away; when he came back, he suggested that she deny having the conversation with her mother because it was not recorded. Tr. at 482-484. At some point, appellant told Holling that the killing was self-defense. Tr. at 484. Appellant also suggested that they get married so that she could not be forced to testify against him. Tr. at 485-486. On cross-examination, Holling conceded that appellant never admitted to anything during the recorded conversations and repeatedly told her to get an attorney before she talked to anyone. Tr. at 510. Holling also conceded that in March 2009, she gave a different summary of what happened and lied about some of the details. Tr. at 508.

{¶20} The State also presented the testimony of a jailhouse informant named Travin Lister. Lister had prior convictions for burglary and receiving stolen property. Tr. at 649. In 2010, Lister was charged with robbery and kidnapping in Licking County. Lister claimed that at some point in 2010, appellant told him that he shot a man and buried him in his backyard. Lister told the detectives and his attorney in hopes of getting a deal on his pending kidnapping and robbery charges. Lister met with prosecutors and entered into an agreement to record his conversations with appellant and get a confession. Tr. at 649-651, 684. Lister's kidnapping and robbery charges were ultimately dismissed pursuant to the agreement. Tr. at 667-668, 684. Lister was not able to record all of his conversations with appellant, but portions of the recordings were played for the jury. Tr. at 657-658. During their conversations, appellant was concerned that Holling would testify against him, but he thought it would backfire on her. Tr. at 653. Lister told appellant it was a mistake not to kill Holling and put her in the

grave with the victim. Appellant responded by joking about having an alibi. Tr. at 655-657. Appellant was also concerned that his neighbor, Chris May, might testify against him. Appellant asked Lister to intimidate May. Appellant allegedly gave Lister information about May, including his phone numbers, the businesses he owned, and the number of children he had. Tr. at 658-660.

{¶21} During one of the recorded conversations, appellant told Lister that he was going to have somebody burn down the house where the murder was committed. Lister offered to burn down the house for a cheaper price and appellant agreed. Appellant drew Lister a map to the house and gave him instructions on how to do it. Lister suggested starting the fire in the middle of the house, but appellant wanted him to start it in the basement. They agreed to use a code to discuss the arson. They subsequently used the code to communicate about it and Lister falsely told appellant that he had done the job. Tr. at 661-667, 686-688.

{¶22} On March 7, 2009, more than eighteen months after Ebright went missing, investigators located and exhumed Ebright's body. Tr. at 556. Investigators did not find any guns, but they found some clothing in the makeshift grave, including a pair of boots. Tr. at 580-581. Three tarps were around or near the body. Tr. at 587. In the basement of the house, investigators did not find any blood, but they did find three .22 caliber shell casings among some debris inside a grey tote. Tr. at 621, 624-627. They also found some PVC pipe that was similar to a piece of pipe that was found wrapped up with the body and a lamp that matched some of the electrical cord that had been used to tie the tarps and body. Tr. at 628-631. During the autopsy, several metal fragments were found in Ebright's head, including two large pieces that indicated the

presence of at least two bullets. Tr. at 730, 735-736. Although they were unable to find any wounds on the skin, investigators found three injuries to the skull that were consistent with bullet wounds. Tr. at 731-732, 737-741. A BCI ballistics investigator testified that the unfired bullet found on the property was a .22 caliber Winchester Super X long rifle rimfire cartridge. Tr. at 791-792. The three casings found in the basement were also .22 rimfire cartridges. Tr. at 793-794. The casings had all been fired from the same gun, which was probably a semi-automatic. Tr. at 795, 801-802, 805-806, 820. The parties stipulated that no detectable DNA evidence or latent fingerprints were recovered. Tr. at 870-872.

{¶23} On October 29, 2010, the Licking County Grand Jury indicted appellant on one count of aggravated murder (with a firearm specification), murder (with a firearm specification), tampering with evidence, gross abuse of a corpse, conspiracy to commit arson, and witness intimidation, under case 10CR598. A second count of intimidation of a witness was later filed under case number 11CR103.

{¶24} Appellant entered a plea of not guilty, and the case proceeded to a jury trial.

{¶25} Prior to trial, the intimidation charge in case number 10CR598 was dismissed at the State's request, and during the trial, the court dismissed the second charge of intimidation under case number 11CR103, pursuant to Crim.R. 29. The jury found appellant guilty of all of the remaining charges. The trial court merged the murder count into the aggravated murder count and sentenced appellant to 30 years to life, plus three years consecutive for the firearm specification. Additionally, the court imposed five years consecutive for tampering, one year consecutive for gross abuse of

a corpse, and one year consecutive for conspiracy to commit arson, for an aggregate term of 40 years to life. See Sentencing Entry, May 10, 2011.

{¶26} Appellant's first appeal was dismissed on December 16, 2011, for want of an appellant's brief, despite several time enlargements. On January 27, 2012, this Court reopened the appeal, and new appellate counsel was appointed.

{¶27} Appellant herein raises the following six Assignments of Error:

{¶28} "I.   APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHT TO THE PRESUMPTION OF INNOCENCE WAS VIOLATED WHEN A GOVERNMENT INFORMANT INFERRED THAT HE SPOKE TO APPELLANT WHEN THEY WERE IN JAIL.

{¶29} "II.   APPELLANT'S RIGHT TO REMAIN SILENT UNDER THE STATE AND FEDERAL CONSTITUTIONS WAS VIOLATED WHEN THE PROSECUTOR COMMENTED DURING CLOSING ARGUMENT THAT AN INNOCENT PERSON WOULD HAVE DENIED THE ALLEGATIONS AND ADVISED HIS CO-DEFENDANT TO SPEAK TO THE POLICE .

{¶30} "III.   APPELLANT WAS DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT DURING CLOSING ARGUMENT TO THE PROSECUTOR'S COMMENTS ON HIS SILENCE.

{¶31} "IV.   THE TRIAL COURT DEPRIVED APPELLANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS BY PROVIDING THE JURY WITH A STANDARD EXPERT WITNESS INSTRUCTION OVER APPELLANT'S OBJECTIONS.

**{¶32}** "V.   THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL DEPRIVED APPELLANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL.

**{¶33}** "VI.    THE TRIAL COURT VIOLATED APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, AND R.C. 2967.28, BY IMPOSING THREE YEARS OF POST-RELEASE CONTROL AT SENTENCING FOR THIRD (NON-SEX OFFENSE), FOURTH, AND FIFTH DEGREE FELONIES.

I.

**{¶34}** In his First Assignment of Error, appellant contends his right to due process was violated by the reference a State's witness made in his testimony suggesting jail deputies had been in the presence of appellant. We disagree.

**{¶35}** During the cross-examination of Travin Lister, who had talked to appellant while the two men were held in the same jail, he was asked by defense counsel if he thought that appellant may have lied to him. Lister replied: "He was telling the truth. I found out he was telling the truth later from the deputies." Tr. at 679. Defense counsel registered an objection and asked to approach. During a sidebar, counsel indicated concern that Lister's reference to deputies may have warranted a mistrial. The trial court responded that the prosecutor had already elicited from Lister the fact that he was incarcerated and being held on charges. Defense counsel thereupon returned to the cross-examination. Tr. at 679-680.

**{¶36}** Appellant herein invokes *Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126*,* wherein the United States Supreme Court determined that a juror's judgment might be affected by a defendant's appearance in prison clothing. In

other words, as explained by the Fourth District Court of Appeals in *State v. Evans,* Scioto App.No. 05CA3002, 2006-Ohio-2564, ¶ 41, "[b]eing compelled to wear prison or jail clothing, like being restrained, erodes the presumption of innocence." *Estelle's* rationale is predicated upon the theory that jail attire serves as a constant reminder that the accused is in custody. *See Holbrook v. Flynn* (1986), 475 U.S. 560, 567. *Estelle* was also predicated upon the fact that "compelling an accused to wear jail clothing furthers no essential state policy." See *Estelle,* 425 U.S. at 505.

**{¶37}** In the case sub judice, of course, appellant was not wearing jail garb at trial; however, he maintains that the inference that he was in jail while talking to Lister was likewise prejudicial to his enjoyment of a presumption of innocence. We first note that because Lister's comments merely referenced "the deputies", it is not certain that any juror would have attributed this comment to be a reference to *jail* deputies, let alone jail deputies that provided security for appellant, as opposed to deputies Lister may have encountered as part of his own pending charges. Nevertheless, we have recognized that testimony alluding to a defendant being transported from jail in a police cruiser is not the factual equivalent of forcing a defendant to appear in court in jail attire. *See State v. Small,* Delaware App.No. 10CAA110088, 2011-Ohio-4086, ¶ 59. Similarly, in *State v. Sharp,* Butler App.No. CA2009-09-236, 2010-Ohio-3470, ¶ 107, the Twelfth District Court of Appeals was not persuaded that "one isolated comment rises to the level of an *Estelle* violation ***."

**{¶38}** We therefore hold the single isolated comment about the presence of deputies falls well short of the type of "constant reminder" of a defendant's custodial status as discussed in *Estelle.* We therefore find no merit in appellant's attempt to

extend *Estelle* to the circumstances of the case sub judice, and we therefore find no reversible error in the trial court's allowance of Lister's testimony in this regard.

{¶39} Appellant's First Assignment of Error is overruled.

II.

{¶40} In his Second Assignment of Error, appellant contends the prosecutor improperly commented during closing arguments regarding the constitutional guarantee against self-incrimination. We disagree.

{¶41} At trial, the jury heard recorded conversations between appellant and Sandra Holling, during which appellant advised Holling, among other things, to get an attorney and not to talk to the police. In reference to those conversations, the prosecutor stated the following during closing arguments:

{¶42} "So, the setting that you get these recordings in makes perfect sense. Perfect sense. The nature of the conversation, what's said, what's not said. If an innocent man is confronted with a girlfriend who is talking about telling her mother that you killed Bob, an innocent man says, what, what would you do that for. That's what an innocent person does. They want to talk to you. Fine, honey, go tell them the truth. I wasn't there. You know it, I know it. Tell them you don't know anything. That's what innocent people do." Tr. at 999-1000.

{¶43} The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that no person shall be compelled to testify against himself or herself in a criminal case. The use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination. *State v. Shaffer,* Richland App.No. 2003-CA-0108, 2004-Ohio-3717,

¶ 19, quoting *State v. Leach* (2004), 102 Ohio St.3d 135, 807 N.E.2d 335, 2004-Ohio-2147. However, the Fifth Amendment right against self-incrimination is a personal right "that can only be invoked by the individual whose testimony is being compelled." *In re Cox*, Stark App.No. 2005CA00233, 2006-Ohio-4579, ¶ 61, quoting *Moran v. Burbine* (1986), 475 U.S. 412, 433, 106 S.Ct. 1135, 89 L.Ed.2d 410, f.n. 4. *See, also, Bigby v. United States I.N.S.* (U.S.C.A. 11, 1994), 21 F.3d 1059, 1062, f.n.3 (recognizing that the Fifth Amendment privilege may not be vicariously asserted).

{¶44} Accordingly, we find no merit in appellant's essential argument under these circumstances that his Fifth Amendment rights were violated when prosecutorial closing arguments were made, without defense objection, alluding to appellant's encouragement to Holling to assert *her* right to remain silent.

{¶45} Appellant's Second Assignment of Error is therefore overruled.

III.

{¶46} In his Third Assignment of Error, appellant contends that he was deprived of the effective assistance of counsel at his trial where said counsel failed to object to the prosecutor's comments during closing arguments regarding the constitutional guarantee against self-incrimination. We disagree.

{¶47} Our standard of review regarding "ineffective assistance" claims is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of *State v. Bradley* (1989), 42 Ohio St .3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; whether counsel's performance fell below an objective

standard of reasonable representation and was violative of any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.* Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, quoting *Strickland* at 697.

**{¶48}** Appellant presently re-directs us to the same prosecutorial commentary at issue in his Second Assignment of Error, and maintains that defense counsel should have promptly objected at that point in closing arguments. However, based on our prior analysis, we are unable to find that defense counsel's decision not to object was violative of any of his essential duties to his client at trial.

**{¶49}** Appellant's Third Assignment of Error is therefore overruled.

IV.

**{¶50}** In his Fourth Assignment of Error, appellant contends the trial court denied him of his right to due process in its provision of certain expert witness jury instructions, over defense counsel's objection. We disagree.

**{¶51}** After the presentation of evidence in the case sub judice, which included testimony from deputy coroner/chief pathologist, a ballistics/firearm scientist, and two

forensic scientists, the following exchange between the attorneys took place before the trial judge:

**{¶52}** "MR. COOPER:  Your Honor  - -  Your Honor, we would object to the jury instructions as to the inclusion of language regarding expert witnesses.  During the trial, Your Honor, it's our position that no witness was identified to the jury as being an expert.  That the qualification of an individual as an expert normally calls for the dissertation of their background and why they should  - -  would be considered an expert, and then we would have an opportunity to cross on the issue of whether that person is, in fact, an expert.

**{¶53}** "That never happened during the trial.  Not that we waived it, but no person or witness was ever identified as being qualified as an expert.  So, if no witness was ever identified through any of the direct examination of any witness to the jury as being an expert, we think it would be inappropriate to include language in the jury instruction as to how to regard an expert's testimony.  Nobody was ever designated as an expert.

**{¶54}** "So, to include that would cause the jurors to assume that individuals who testified were experts without any qualifying features, so, therefore, we feel that language would be inappropriate to include in the jury instruction.

**{¶55}** "THE COURT:  Mr. Oswalt.

**{¶56}** "MR. OSWALT:  Your Honor, if it please the Court.  There is clearly the testimony from several individuals of an expert nature and, therefore, it's appropriate to describe them as such.  If Mr. Cooper or Mr. Wolfe felt that the foundation for them

expressing expert opinions was insufficient, their obligation was to object on a timely basis.

{¶57} "***

{¶58} ""So, if the  - -  if Mr. Cooper felt that there was insufficient foundation to give expert opinions, then he should have objected on a timely basis.

{¶59} "***

{¶60} ""There was no such objection here, and as a result, there was no requirement under Ohio law or any other that the State tender somebody for a formalized request of the Court to designate them as an expert.  In fact, as I've mentioned, these Courts find that to be in error.

{¶61} "THE COURT:  Anything else, Mr. Cooper?

{¶62} "MR. COOPER:  Well, I would submit, Your Honor, I don't believe that's -- that that case law applies to this case.  We can't object to somebody being an expert if we don't know they're trying to qualify somebody as an expert.  If they never say this person is an expert.  And just to say I work for BCI and I've gone to training classes doesn't necessarily mean that person is an expert on what they're testifying to.  If they didn't tell us, if they didn't notice us, if they didn't tell the jury, then how could we object to the unstated, subjective intent of the prosecution that somebody is an expert witness without telling anybody.  Didn't even tell the witness that they're an expert.  So, how are we supposed to object.

{¶63} "THE COURT:  Well, I'll include the instruction  clearly the  - -  several witnesses did meet the requirements to be determined experts should they have been

proffered or found to be that way by virtue of their background and training and their experience.

**{¶64}** "The instruction simply provides the jurors with another method of assessing their testimony and goes to their credibility and doesn't highlight or diminish their testimony either way. And on that basis, I will overrule your objection to that section of the charge."

**{¶65}** Tr. at 911-915.

**{¶66}** The Supreme Court of Ohio has stated that "a witness may qualify as an expert by reason of his or her 'specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.' " *State v. Foust,* 105 Ohio St.3d 137, 2004–Ohio–7006, ¶ 77, 105 Ohio St.3d 137, 823 N.E.2d 836, quoting Evid.R. 702(B). Our standard for appellate review of jury instructions is whether the trial court's decision on giving a requested instruction constituted an abuse of discretion under the facts and circumstances of the case. *See State v. DeMastry,* 155 Ohio App.3d 110, 2003-Ohio-5588, ¶ 72, citing *State v. Wolons* (1989), 44 Ohio St.3d 64, 68. In addition, because the failure to properly instruct the jury is not in most instances structural error, the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, applies to a failure to properly instruct the jury, for it does not necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. *State v. Bleigh*, Delaware App.No. 09-CAA-03-0031, 2010-Ohio-1182, ¶ 119, citing *Neder v. United States* (1999), 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35.

{¶67} Although case law exists in Ohio indicating that forensic scientists testifying for the State in a criminal prosecution should be qualified as experts outside the presence of the jury (see *State v. Bolton*, Cuyahoga App.No. 96385, 2012-Ohio-169, ¶ 62, citing *United States v. Johnson* (C.A. 6, 2007), 488 F.3d 690), we find no abuse of discretion in the trial court's allowance of the final expert witness instruction to the jury under the circumstances of this case. Moreover, given the level of eyewitness and circumstantial evidence presented by the State as to appellant's guilt, as set forth in our initial recitation of facts, we find any potential error in this regard would have been harmless. *Chapman*, *supra*.

{¶68} Appellant's Fourth Assignment of Error is overruled.

V.

{¶69} In his Fifth Assignment of Error, appellant contends he was deprived of a fair trial based on the cumulative effect of errors in the trial court. We disagree.

{¶70} The doctrine of cumulative error provides that a conviction will be reversed where the cumulative effect of evidentiary errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not singularly constitute cause for reversal. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 509 N .E.2d 1256, paragraph two of the syllabus. The doctrine has been expanded to include the cumulative effect of all errors, not just evidentiary errors. *See State v. Neal*, Champaign App.Nos. 2000–CA–16, 2000–CA–18, 2002-Ohio-6786, ¶ 101, citing *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 1995–Ohio–168. Nonetheless, the doctrine is not applicable to cases where the court has not found

multiple instances of harmless error. *State v. Skerness*, Coshocton App.No. 09-CA-28, 2011-Ohio-188, ¶ 77, citing *Garner*.

**{¶71}** In support of his argument, appellant essentially redirects us to the issues referenced earlier in his brief, particularly as to Lister's testimony and the issue of the expert witness jury instruction. Notwithstanding this Court's past reluctance to embrace cumulative error as grounds for reversal (*see State v. Mascarella* (July 6, 1995), Tuscarawas App.No. 93AP100075), having presently reviewed the record, we find reversible error has not been demonstrated on this basis.

**{¶72}** Appellant's Fifth Assignment of Error is overruled.

VI.

**{¶73}** In his Sixth Assignment of Error, appellant argues the trial court erred and violated his right to due process by imposing three years of post-release control ("PRC") on certain of the lesser-degree felonies. We agree.

**{¶74}** Pursuant to R.C. 2967.28(C), post-release control for felonies of the third degree, fourth degree, and fifth degree (except those subject to R.C. 2967.28(B)(1) or (B)(3)) is left to the discretion of the parole board, which must wait to review the offender's conduct while in prison and need not impose a full three years of sanctions. As appellant notes, R.C. 2967.28(C) further provides that any sentence for such felonies "shall include a requirement that the offender be subject to a period of post-release control of up to three years after the offender's release from imprisonment, if the parole board* * * determines that a period of post-release control is necessary for that offender." Furthermore, under R.C. 2967.28(D) in these circumstances, the parole board is required to review a prisoner's criminal history and the record of the prisoner's

conduct while imprisoned before deciding whether to impose post-release control. Therefore, we find appellant's sentence with respect to post-release control is at least voidable. *See State v. Richards,* Licking App.No. 2011-CA-0074, 2012-Ohio–1115, ¶ 55, citing *State v. McKenna,* Trumbull App.No. 2009–T–0034, 2009–Ohio–6154, ¶ 84.

**{¶75}** Accordingly, we vacate the judgment of the trial court as far as it relates to the imposition of post-release control for the (non-R.C. 2967.28(B)(1) or (B)(3)) third-degree, fourth-degree, and fifth-degree felonies. We will remand this matter to the trial court to modify appellant's sentence with respect to PRC for such felonies, such that appellant's sentence shall include a requirement that appellant be subject to a period of post-release control of up to three years after appellant's release from imprisonment, if the parole board, in accordance with R.C. 2967.28(D), determines that a period of post-release control is necessary for him.

**{¶76}** Appellant's Sixth Assignment of Error is sustained.

**{¶77}** For the reasons stated in the foregoing, the decision of the Court of Common Pleas, Licking County, Ohio, is hereby affirmed in part, reversed in part, and remanded.  We vacate the judgment of the trial court only as far as it relates to the imposition of post release control for the (non-R.C. 2967.28(B)(1) or (3)) third-degree, fourth-degree, and fifth-degree felonies, and remand this case to the trial court to modify appellant's sentence accordingly.

By: Wise, J.

Farmer, J., concurs.

Hoffman, P. J., concurs separately.

_____

_____

_____

JUDGES

JWW/d 0713

*Hoffman, P.J., concurring*

{¶78} I concur in the majority's analysis and disposition of Appellant's Assignments of Error I, IV, V, and VI.

{¶79} I further concur in the majority's disposition of Appellant's Assignments of Error II and III. While I agree Appellant's encouragement to Holling to assert her right to remain silent does not implicate Appellant's right to remain silent, I find the prosecutor's reference to what "an innocent man" would have said and done not only implicates it, but also is an indirect comment on Appellant's fifth amendment privilege. While I find such comment improper, I would find it harmless beyond a reasonable doubt when considered in light of the overwhelming evidence of guilt. The comment clearly did not rise to the level of plain error nor was there a reasonable probability the outcome of the trial would have been different had it not been made.

_____
HON. WILLIAM B. HOFFMAN

IN THE COURT OF APPEALS FOR LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee                 :
                                       :
-vs-                                   :          JUDGMENT ENTRY
                                       :
GEORGE GAONA                           :
                                       :
    Defendant-Appellant                :          Case No. 11 CA 61


For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Licking County, Ohio, is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

Costs to be split equally between the parties.


_____

_____

_____

JUDGES